ALFRED TREPP, Trustee in Bankruptcy of UNITED PACKING & PRESERVING COMPANY, v. STATE NATIONAL BANK, Appellant.

Division One, October 11, 1926.

**1. DEMURRER TO EVIDENCE: How Considered.** In considering a demurrer to the evidence, the plaintiff is entitled to have the evidence in his favor accepted as true, and to every reasonable inference to be drawn therefrom.

**2. ———: Notice: Inquiry.** In considering a demurrer to the evidence, notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop.

3. ————: **Bankruptcy: Unauthorized Preference: Belief: Inquiry: Notice of Facts.** In a suit by a trustee in bankruptcy of an insolvent corporation, to recover the amount of a payment made to a bank before the petition in bankruptcy was filed, based on the alleged ground that the payment constituted a preference over other creditors, and wherein the evidence shows that all the inquiries, arrangements and conversations concerning the business of the corporation and its relations to the bank were had with the bank's vice-president, and wherein the outstanding issue is whether the vice-president had reasonable cause to believe the corporation was insolvent at the time the payment was made and that such payment would effect a preference, it cannot be ruled that the demurrer of the defendant bank to the evidence should have been sustained where the testimony shows many things calculated to incite the vice-president as a person of reasonable prudence to an inquiry into the question of the corporation's solvency, and that reasonable diligence would have developed many reasonable grounds for a belief that the corporation was not only insolvent, but that the payment would deprive other creditors of their just proportion of the net assets, and therefore constituted an unauthorized preference.

4. **PREFERENCE: Bankruptcy: Suspicion: Reasonable Ground.** A mere suspicion, on the part of a person receiving a payment of money due from a corporation afterwards adjudged a bankrupt, that such payment will operate as a preference, is not sufficient to sustain an action by the trustee to recover the payment; but where the established facts show that the preferred creditor had reasonable cause to believe that a preference would result from the payment, the trustee is entitled to recover. The statute requires belief that a preference will result, not merely that it might result; and belief that it will result implies something more than a suspicion that it might result.

5. ————: ————: **Facts to Incite Inquiry: Question for Jury.** The debtor company's plant had been practically destroyed by fire. Its manager insisted that it could continue in business, but another stockholder thought its affairs should be closed up, and both expressed to the vice-president of the bank, which held its note, that there would be something left after paying its debts. The vice-president knew these facts, and further knew or had cause to believe that the debtor's indebtedness had been misrepresented to him. Before the payment was made the vice-president had ceased to rely upon the statements of the manager as to what the debtor owed. The claims called to his attention exceeded the amount of the insurance which he knew was to be paid. The salvage was open to inquiry, and he knew that the accounts receivable were payable to another company, and a mere calculation of the assets ascertainable would have shown him that if the insurance money, deposited in the bank, were used to pay the note, there would not remain enough to pay other creditors. **Held,** that these facts were sufficient to put a reasonably prudent person on inquiry, and they and other facts which the inquiry would have developed were substantial evidence tending to show that the vice-president had reasonable cause to believe that the company was insolvent, and that the payment to the bank, made before the petition in bankruptcy was filed, would effect a preference, and the question of the right of the trustee to recover the amount of the payment was one for the jury.

6. **INSTRUCTION: Harmless Error.** Although the instruction submitted for finding by the jury various things which could have been avoided and ought to have been avoided, it will not be reversible error if under the circumstances of the case it could not have worked prejudicially.

7. ————: **Modification.** A modification of an instruction asked by appellant, and the giving of it as modified, makes it the court's instruction; and if appellant excepted to the refusal of the instruction as asked, and to

its modification and the giving of it as modified, both exceptions are for review on appeal.

8. ————: **Preference: Definition: No Request.** A statutory word having a technical meaning should be defined in the instructions; but in a civil case a party desiring a definition of a technical word must ask an instruction defining it, and if he does not he cannot complain that the word was not defined. Where the real issue was whether the appellant knew or had reasonable cause to believe the payment accepted by it would effect a preference within the meaning of the bankruptcy law, and neither side offered a separate instruction defining specifically the word "preference," appellant cannot be heard to complain that there was no proper definition or guide to the jury as to what constituted a preference, or that the jury were misled and confused by such omission; and especially so, where the other instructions given presented every element entitling respondent to recover, including the hypothesis that if appellant at the time the payment was made "had reasonable cause to believe" that the debtor "was insolvent, and that said payment would effect a preference in favor" of the appellant and enable the appellant "to obtain a greater percentage of its debt than other creditors."

9. ————: **Refusal: Covered by Others.** The test of error on appeal is not whether the instructions refused presented proper propositions of law applicable to the evidence and pleadings, but whether those propositions were embodied in the instructions given. Where the charge to the jury was unobjectionable and presented every element of the pleaded action embraced by the pertinent evidence which defendant was entitled to have submitted to the jury, he cannot on appeal be heard to complain that instructions asked by him and embodying the same propositions in a different form were refused.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 3013, p. 1029, n. 30. **Bankruptcy,** 7 C. J., Section 248, p. 151, n. 78; Section 252, p. 154, n. 97; Section 433, p. 270, n. 82, 83, 84 New, 87; Section 439, p. 274, n. 49, 51 New. **Trial,** 38 Cyc., p. 1543, n. 68, 69; p. 1687, n. 87; p. 1688, n. 18, 19; p. 1689, n. 20; p. 1711, n. 19; p. 1721, n. 41 New; p. 1788, n. 6.

Appeal from Circuit Court of City of St. Louis.—*Hon. A. B. Frey,* Judge.

AFFIRMED.

*Jones, Hocker, Sullivan & Angert* for appellant.

(1)  The court erred in refusing to sustain the appellant's demurrer to the evidence. (a) The evidence is wholly insufficient to sustain a finding that the defendant had reasonable cause to believe that the payment of its debt would effect a preference.  Grant v. Nat. Bank, 97 U. S. 81; In re Solof, 2 Fed. (2 Ser.) 130; Getts v. Grocery Co., 163 Fed. 419; Paper v. Stern, 198 Fed. 642; Powell v. Gate City Bank, 178 Fed. 609; Hussey v. Dry Goods Co., 148 Fed. 598; Closson v. Hardware Co., 283 Fed. 33; In re Salmon, 249 Fed. 300; Irish v. Citizens' Trust Co., 163 Fed. 880; Sumner v. Parr, 270 Fed. 675; In re Looschen Piano Co., 259 Fed. 934; In re Houghton-Webb Co., 185 Fed. 213; Hamilton National Bank v. Balcomb, 177 Fed. 157; First Nat. Bank v. Galbraith. 271 Fed. 687.  (b)  The burden of proof is upon the plaintiff trustee to show that the vice-

president of the defendant had reasonable grounds to believe that a preference would result. It is not sufficient to show that he may have had reasonable grounds to believe that a preference might result from the payment to the defendant. Mere suspicion that a preference would result is not sufficient to sustain such burden. Sumner v. Parr, 270 Fed. 676; Paper v. Stern, 198 Fed. 642; Sharpe v. Allender, 170 Fed. 589; Reber v. Louis Shulman & Bro., 179 Fed. 574; Bank of Commerce v. Brown, 249 Fed. 37; Nichols v. Elken, 225 Fed. 689; Rosenman v. Coppard, 228 Fed. 115; Newman v. Dry Goods Co., 174 Mo. App. 534. In considering the sufficiency of the evidence, the court must give effect to the testimony of Mr. Bixby that he took into consideration all debts within his knowledge and that he thought the United Packing & Preserving Company had sufficient assets with which to pay all of its debts. Alter v. Clark, 193 Fed. 159; Newman v. Dry Goods Co., 174 Mo. App. 535. The explanations obtained by the defendant's vice-president, and the repeated statements of the parties and their attorneys that the company would be able to pay all creditors in full, sufficiently rebutted any suspicious circumstances which came to his knowledge. Hamilton National Bank v. Balcomb, 177 Fed. 157; Smith v. Hewlett-Robin Co., 178 Fed. 271; In re Varley & Beauman Clothing Co., 191 Fed. 461; Tumlin v. Bryan, 165 Fed. 166; Edwards v. Milling Co., 108 Mo. App. 286; Newman v. Dry Goods Co., 174 Mo. App. 535. (c) The situation must be viewed by the court as it appeared to Mr. Bixby at the time of the payment received by the defendant—the apparent value of the assets at the time of such payment, and not what they brought after shrinkage by bankruptcy or on disposal of the same to themselves for selfish purposes by the officers of the United Packing & Preserving Company. Peck & Co. v. Whitmer, 231 Fed. 897; Sumner v. Parr, 270 Fed. 676. The defendant was not required to make an inventory or a thorough and searching investigation of the assets and liabilities of the company before accepting payment. It was required to do no more than exercise common prudence in investigating such debts and circumstances as were brought to its attention. Edwards v. Milling Co., 108 Mo. App. 286. (d) That the United Packing & Preserving Company was allowed to overdraw its account is not evidence of or notice of insolvency. On the contrary, the overdrafts would more likely indicate a belief in the solvency of the company. Grant v. Nat. Bank, 97 U. S. 82; In re Looschen Piano Co., 259 Fed. 934; In re Houghton-Webb Co., 185 Fed. 213. (e) The defendant is chargeable with such facts only as inquiry at the time reasonably developed or would have developed. It must be considered also that all of the alleged debts called to the attention of Mr. Bixby by Mr. Rich were fully investigated by him and his conclusion that the company was solvent was reached after what he thought to be a fair ap-

praisal of the facts. In re Gaylord, 235 Fed. 241; Farmers' State Bank v. Freeman, 249 Fed. 583; Tilt v. Trust Co., 191 Fed. 441; In re W. W. Mills Co., 162 Fed. 42. (2) The court erred in striking out of defendant's Instruction 2, as offered, the clause defining the meaning of "preference," as no other instruction was given properly defining that technical word. The instruction as given, as well as all other instructions given the jury, in effect permitted the jury to define the word and therefore pass upon a question of law. That the word as used in the Bankruptcy Act has a well-defined and technical meaning apart from the ordinary meaning of the term is evidenced by the many decisions with reference to its meaning under the various acts of bankruptcy and amendments thereto. Mulderig v. Railroads, 116 Mo. App. 655; Turnbow v. Dunham, 272 Mo. 53; Mitchell v. Violette, 203 S. W. (Mo. App.) 218; Scheidel X-ray Co. v. Bacon, 201 S. W. (Mo. App.) 916; 38 Cyc. 1686-1688. (3) Plaintiff's Instruction 1, as given, erroneously submitted conceded facts to the jury and thereby raised false issues and beclouded the only real issue in the case. The defendant was thereby placed in a false light before the jury and its case prejudiced by the unnecessary reference to facts about which there could be no dispute. The error was not harmless in view of the majority verdict of the jury. Windson v. Railroad, 45 Mo. App. 128; Estes v. Desnoyers Shoe Co., 155 Mo. 588; Boyce v. Wheeler, 197 Mo. App. 308; McQuillan's Instructions to Juries, sec. 111; 38 Cyc. 1670, 1671.

*Smith & Pearcy* for respondent.

(1)  On a demurrer to the evidence there is a stiff general rule that the defendant's evidence where contradicted is false and the plaintiff's is true. The court must allow to plaintiff's case the benefit of every reasonable inference of fact that may be reasonably deduced from the evidence. Montague v. Railroad, 305 Mo. 269; Williams v. Railroad, 257 Mo. 87; Strauchon v. Met. St. Ry. Co., 232 Mo. 587; Meily v. Railroad, 215 Mo. 567. (2) A preference is effected according to the Bankruptcy Act by a person while insolvent and within four months of the filing of a petition in bankruptcy, transferring any of his property to a creditor, which enables the creditor to obtain a greater percentage of his debt than any other creditor of the same class. Such preference is voidable by the trustee if at the time of the receipt of such payment the creditor "shall then have reasonable cause to believe that the transfer would effect a preference." Sec. 60, Bankruptcy Act, as amended by Act of 1910; 1 Fed. Stat. Ann. (2 Ed.) pp. 1004 et seq.; 2 Collier on Bankruptcy (3 Ed.) p. 1239; 4 Remington on Bankruptcy (3 Ed.) p. 395. The Act of 1910 provides that such preference shall be voidable if the

creditor "shall then have reasonable cause to believe that the enforcement of said judgment or transfer would effect a preference." 4 Remington on Bankruptcy, sec. 1824, p. 634; Newman v. Dry Goods Co., 174 Mo. App. 528. (3) In order that a preference transfer should be deemed voidable under the provisions of Section 60 (b) of the Bankruptcy Act, it is not necessary that the person to be benefited thereby should know positively that the result of the transaction would be the effecting of a preference, but it will be sufficient if the person preferred or his agent therein have knowledge or notice of such facts and circumstances as would incite a person of reasonable prudence under similar circumstances to make inquiry, where such inquiry would have developed the facts essential to a knowledge of the situation. The defendant is chargeable with all knowledge which a reasonable inquiry would have disclosed. Farmers State Bank v. Freeman, 249 Fed. 583. It is not the actual belief of the creditor but the belief he ought to have had in view of the facts known or ascertainable. McGee v. Brannan, 2 Fed. (2 Ser.) 758. (4) The court did not err in striking out a portion of defendant's Instruction 2. Plaintiff's Instruction 1 given by the court stated that if the defendant has reasonable cause to believe that the payment would enable it to obtain a greater percentage of its debt than other creditors, then the verdict should be in favor of plaintiff. This is a sufficient definition of the term preference.

LINDSAY, C.—This is a suit to recover the amount of a payment made to defendant, which, it was alleged, constituted a preference over the other creditors of the bankrupt company.

The trustee, as plaintiff, had a verdict returned by nine jurors, for $8,718.33, the sum asked for. The primary assignment of error is founded on the contention that under the evidence plaintiff was not entitled to go to the jury. Errors are also assigned in the giving and refusal of certain instructions.

The payment in question was made on January 20, 1922. The petition in bankruptcy was filed on February 28, 1922, and the adjudication was made June 23, 1922. Prior to the spring of 1921, the United Packing & Preserving Company, a corporation, had been engaged in business under the name of A. M. Neville Manufacturing Company. As the Neville Manufacturing Company it had been in financial difficulties, and a petition in bankruptcy had been filed against it. Pending that, one A. F. Ruppenthal, who had not theretofore been a stockholder, became interested in the company, and undertook to put it upon its feet and continue the business, which appears to have been the manufacture and sale of fruit products. In doing so, there was no reorganization, but merely a change in the name of the company. Ruppenthal undertook to pay in whole, or in

part, the creditors of the company. Some of them were paid seventy-five cents on the dollar, and an agreement was made with others, whereby the company continued in business. At that time the company did its banking business with the Lafayette South Side Bank of St. Louis, and was indebted to that bank in a sum in excess of $10,000. Mr. Ruppenthal applied to Mr. Harold Bixby, vice-president of the defendant State National Bank, for a loan, and with the purpose of transferring the account of the company to defendant bank. The arrangement was made, and defendant bank loaned the United Packing & Preserving Company $7,500. At that time, and by aid of the loan thus secured, the indebtedness due from the company to the South Side Bank was paid, except an indebtedness for $3,000, for which the South Side Bank held warehouse receipts for certain raspberries, as collateral security. The United Packing & Preserving Company continued to do business until the 17th day of November, 1921, at which time a fire occurred, which destroyed its stock, and in a large measure destroyed its equipment, fixtures and the like. The company held insurance policies in the amount of $35,000. Adjustment of the loss was undertaken by Mangson & Mangson, insurance adjusters. An adjustment was reached with the various companies, whereby the total sum of $25,673.35 was paid by the insurance companies. The first payment from the insurance companies was deposited on January 20, 1922, in the sum of $12,836.67, in defendant bank. The conditions surrounding this deposit of insurance money are to be more particularly given hereafter. At the time, there was due from the United Packing & Preserving Company, to defendant bank, the sum of $8,718.33.

As has been stated, that indebtedness was paid on the day of such deposit, by checks of the United Packing & Preserving Company, drawn by Ruppenthal. All of the inquiries, arrangements and conversations had concerning the business of United Packing & Preserving Company, its indebtedness, and its relations with defendant bank, were had with Mr. Bixby as vice-president of the bank. The outstanding issue in this case was the question whether Mr. Bixby had reasonable cause for believing the United Packing & Preserving Company was insolvent, at the time said payment was made, and that such payment would effect a preference.

On June 16, 1921, United Packing & Preserving Company made to defendant a statement of its financial condition. This was introduced in evidence. It showed cash on hand $3.85, cash in banks $28.48, accounts receivable $3,471.22, and merchandise as by inventory $13,832.91. It further showed as the value of plant machinery and equipment, furniture and fixtures, cuts, dies, etc., $9,667.99. There was also listed as real estate a lot in Maplewood at $945, and the leasehold on a building on South Broadway at $7,200. The total of the

assets so represented was $31,867. Against this the statement showed as liabilities a note of $7,500 (due to defendant) and accounts payable in the sum of $767.08, making a statement in excess of assets over liabilities of $23,599.92.

Another statement made to defendant on August 1, 1921, was introduced. This statement showed some increase in the amount shown by inventory, and accounts receivable; some increase in machinery and equipment, and also an increase in indebtedness, but left an excess of assets over liabilities of $25,408.01. This statement, however, showed that at the time the company had on hand in cash and in bank only $105.72. About this time, it appears that Mr. Bixby undertook to assist the company, through getting interested some one else, with money, whereby its ability to carry on the business might be increased. He took up the matter with Mr. Ford, who was interested in another company—the Evans-Rich Manufacturing Company. As a result, Mr. Rich, of the Evans-Rich Manufacturing Company, took up the matter with Ruppenthal, and a written agreement was entered into by the Evans-Rich Company and the United Company, under which the Evans-Rich Company was to pay for the raw materials, which were needed to fill the orders which the United Company had or might receive. Under that contract, goods so manufactured, when sold by the United Company, were billed by the Evans-Rich Company to the purchaser at the price fixed, and when the purchaser remitted to the Evans-Rich Company the amount, the United Packing & Preserving Company was to be given credit on the loan, or advancement made by the Evans Company. Under the contract also, Mr. Rich, or the Evans-Rich Company, had an option to buy the plant of the United Company; and, pending operation under this contract, and prior to the fire that has been mentioned, an inventory of the property of the United Company was made by Mr. Rich and Mr. Ruppenthal, and prices agreed upon as to the value of merchandise, machinery and fixtures. Under this the machinery and fixtures were valued by them at $6,900, and the merchandise at $8,617.

After the fire, the creditors of the United Packing & Preserving Company were uneasy as to the payment of their bills against the company. Pending adjustment and payment of loss by the insurance companies, an agreement in writing was entered into by the defendant bank and the United Packing & Preserving Company, under the terms of which the insurance money was to be deposited in defendant bank, as a special fund, from which to pay to itself the note and overdraft due to it, and also to pay numerous creditors included in a list delivered to defendant bank along with said contract. The contract stated the amount of the indebtedness due defendant and also. that the total due to the creditors upon the list was $6,784.25. It also

contained the condition that until the sums paid in and deposited on the insurance should amount to or exceed the total of the indebtedness due to the bank, and the indebtedness due to the creditors listed, the bank should not make any of the payments aforesaid, but should retain said deposit for the equal protection of all the creditors of said company. In the list, about seventy-five creditors were named, nearly all being for small amounts. The aggregate of the indebtedness referred to in said contract, that due defendant and the total of the list, was $15,372.66, plus the interest due on the note held by defendant.

The evidence tends to show that the United Packing & Preserving Company was insolvent on January 20, 1922. The trustee, who testified in this suit, said that nothing whatever belonging to the bankrupt estate had come into his hands. The total amount of the claims allowed by the referee was $7,435.33. This included the claim for taxes of $596.17 for the year 1922. This list does not include the McCandless claim referred to hereafter. It appears that prior to his appointment and qualification, the insurance money had been paid out. The salvage, or junk, remaining from the fire had been sold to Ruppenthal and others. These two items with the accounts receivable, constituted, after the fire, all the assets except a shipment of apple chops, which arrived a day or two after the fire, not paid for, to which reference will hereafter be made. Practically all of the accounts receivable of the United Packing & Preserving Company were held by Evans-Rich Manufacturing Company under the contract between the two companies, and Evans-Rich Company collected the accounts receivable which were against solvent persons, to the amount of $3,101.50, which, applied upon the indebtedness of $9,118.55 due from the United Company to the Evans Company, left a net indebtedness due the Evans Company of $6,017.05, which was the sum allowed by the referee. The small amount of accounts receivable, other than those held by Evans-Rich Company, is more fully shown by the fact that according to the evidence, between the time of the fire, on November 17, 1921, and January 20, 1922, the sum of $143.22 was the whole amount collected, or at least deposited in defendant bank to the credit of the United Packing & Preserving Company. This was deposited to its general account, and not to the special account mentioned.

During part of the time, in the period beginning about November 1, 1921, the account of the company stood overdrawn by small amounts. On January 20, 1922, there was an overdraft of $338.41 against the bankrupt company. This was a part of the indebtedness taken up on January 20, 1922. The real estate in Maplewood mentioned in the financial statements made to defendant in June and August, 1921, was under a mortgage which was foreclosed in June,

1921, a few days after the date of the first statement. The leasehold on the property on South Broadway in St. Louis had no value after the fire. The building was practically destroyed, and the leasehold was valueless and was abandoned, and no value was claimed for it otherwise than that it had been included as an asset and of the value of $7,200, in the financial statements made in June and August, 1921, to Mr. Bixby.

There was a large indebtedness existing on January 20, 1922, additional to the indebtness stated in the list which defendant bank held in connection with the contract for special deposit of the insurance money. There was the claim of Evans-Rich Manufacturing Company, which has been mentioned, in excess of $9,000, subject to reduction, however, in the amount received upon accounts held by that company. There was unsettled the indebtedness of $3,000 to the South Side Bank. There was due to Monongah Glass Company, upon one account the sum of $1779.05, and upon another account the further sum of $69.45. There was due to the auditor, adjuster and stenographer engaged in procuring a settlement with the insurance companies, the aggregate sum of $1410 to be paid, and which was paid out of the insurance money. There was also an indebtedness of $487.05, due to Julius F. Muench, and the sum of $1100 due to W. A. McCandless. There was also a suit for $10,000 pending in the circuit court, brought several months before by Jim Anderson Company. In addition to these there was an unadjusted claim with Ward Goodloe for $1874.30. This amount was the price to be paid for the shipment of apple chops, purchased by the United Company, which shipment arrived the day after the fire, and remained, pending an adjustment by the parties, as above mentioned.

There was testimony as to the value of the salvage, or junk, as it was spoken of by some of the witnesses. Mr. Rich, who had made an inventory and an agreed valuation of the property shortly before the fire, with the view of purchasing the plant, said it was so nearly completely destroyed that what was left was not worth $1,000.

Mr. H. G. Wilson, an attorney, had been employed by Goodloe to procure payment of the claim for the apple chops. After he had received payment for the apple chops, he was employed, by Mr. Ruppenthal and others interested, to represent the United Packing & Preserving Company. The circumstances surrounding the payment of the Goodloe claim will be given hereafter. Mr. Wilson said that all the assets the company had after the fire, was the insurance money, and some junk—"some copper kettles and some junk of that sort, that had not been utterly ruined in the fire, and had been salvaged and taken away to some other place." He said that he, with the company's officers, checked up closely what the company owned. He further said that the apple chops and the junk were sold for $2,000.

Other testimony was to the effect that the value of the apple chops was equal to the amount of the bill for them, $1874.30. The value of the salvage and what Mr. Bixby may have thought it was worth, is not wholly clear. In the statement signed for the company in adjusting the loss, the difference between value and loss stated is $6,482.50.

The next inquiry is directed toward the question of what Mr. Bixby knew or had reasonable grounds to believe, as to the assets of the company, and their value, and the indebtedness of the company, at the time he received for defendant bank payment of the indebtedness due it from the United Packing & Preserving Company.

A considerable part of the information coming to Mr. Bixby concerning the affairs of the United Packing & Preserving Company, as they existed after the fire, came from Mr. Rich, of the Evans-Rich Company, but there is other testimony along the same line. Mr. Rich testified that having heard there was an agreement for the insurance money to be deposited with the defendant bank, and that therewith was placed a list of creditors to be paid, he saw Mr. Bixby, in the early part of December, 1921, and inquired whether Evans-Rich Company's claim was listed. He was shown the list by Mr. Bixby, who said he was surprised, when told that the list did not include all the indebtedness. Mr. Rich testified that he then said to Mr. Bixby: "I am sure it doesn't cover all, as the Evans-Rich is not on there and I know one other who has a trade acceptance that is for the Monongah Glass Company, of $1700. . . . I think there are other creditors that are not on this list besides the ones I mentioned." Mr. Bixby suggested that Rich call again, and bring with him the contract between the Evans-Rich Company and the United Packing & Preserving Company. He did so, and the matter was again talked over by Rich and Bixby, with Mr. Pettus, the attorney for the bank. This was on the day following the first talk with Bixby. Two or three days afterward there was another conference. At this conference Mr. Bixby, who, in the interim, had seen Mr. Ruppenthal, told Rich that the reason the Evans-Rich claim was not listed was that Mr. Ruppenthal said it was a contested claim. Mr. Rich testified as to what he said to Bixby at that conference: "And I told him then that from the figures I had that the company was insolvent, and unable to pay their debts, and if my name was not included on this list I would file bankruptcy proceedings against the United Packing & Preserving Company, and Mr. Bixby said: 'Don't take any action like that. Give me time and I will get your name on this list, so that you will be paid along with the other creditors.' " Rich said there was a number of meetings had, endeavoring to get the Evans-Rich Company's name put on the list, but it was never done. Mr. Rich also testified as to another meeting had either in December or

in January, and at a time prior to January 20th, at which Mr. Bixby, Mr. Lansden and Dr. McCandless and his son were present, and also Mr. Ruppenthal. This meeting was had at the office of Mangson & Mangson, the insurance adjusters. Mr. Rich, stating a conversation had on that occasion, said: "Mr. Bixby told Mr. Ruppenthal 'the Evans-Rich name is not on this list' and said: 'Why don't you put it on;' and he said: 'Because the claim is a contested claim.' And Mr. Bixby said: 'You gave this to me as a sworn statement of all the United Company's creditors, and if you don't agree to put them on this list, or agree to turn over the affairs of the company to someone else, I will bring action against you on the sworn statement you made to the bank.'" Mr. Rich further testified that on this occasion Mr. Ruppenthal agreed to relinquish his position with the company and turn the affairs over to someone else, and left the room, and that he thought at the time Mr. Bixby dictated a letter to a stenographer to be signed by Mr. Ruppenthal, resigning from the company; that when Mr. Ruppenthal returned to the room and started to sign it, he said he would not sign it; that it was a reflection upon his character, and said to Mr. Bixby: "This company is able to pay their debts," and Rich thereupon said: "If my name is not on that list, I will immediately file suit for bankruptcy." Also Mr. Rich, testifying to a conversation with Mr. Bixby had before January 20, 1922, said: "There was one meeting—I was in touch with the affairs of the United Packing & Preserving Company and I had had a conference at one time with Mr. Bixby in which we had learned how much the insurance was going to be, and I sat down and figured with him and showed him the amount of money that the company owed on this list they had presented to the bank, and the amount they owed the bank, and the amount they owed the Monongah Glass Company, the amount they owed us, and showed him that the amounts of the other debts were larger than the amount of money they were going to receive. And I said, 'This company is unable to pay their obligations in full.'" At this time Mr. Bixby knew and told Mr. Rich the amount that would be paid on the insurance.

There was an indebtedness due from the United Company to Mc-Candless. It appears that he had been interested in the company, and there is evidence that at one time there was an agreement made for him with Ruppenthal, that because of the large indebtedness of the company he and Ruppenthal should not make claim for payment of the indebtedness due them, but later McCandless insisted that his note be paid on the ground that the agreement to forego had been made by his son, who had no authority to wipe off the obligation. Mr. Rich said that Mr. Bixby knew the note held by McCandless was discussed and explained one time when Mr. Bixby was present, Mr.

Bixby's testimony was that Ruppenthal and McCandless had mutually agreed to waive payment of what was due them.

According to Mr. Rich, there was also discussion of the claim of the South Side Bank against the United Packing & Preserving Company. That was a claim which Ruppenthal said was a contested claim. It was not put upon the list. The evidence as to that claim was to the effect that for the $3,000 of indebtedness remaining due the South Side Bank, the bank had held collateral consisting of the account or acceptance covering a shipment of raspberries; that the raspberries had spoiled; that afterward the claim was put into the hands of the attorneys, Rassieur & Long, who, after the fire, were threatening to attach the insurance money. On January 23, 1922, a check was given by the United Packing & Preserving Company, through Ruppenthal, to Mr. Goodloe, for the amount of the claim for apple chops. When this check was presented to defendant bank, Mr. Bixby refused to pay it. Mr. Wilson saw Mr. Bixby, and insisted that the check be paid. Mr. Bixby in refusing referred to the Evans-Rich claim. Wilson suggested that the United Company did not owe the Evans-Rich Company anything, and that there was enough to pay all debts. Mr. Wilson testified: "But Mr. Bixby said that they claimed they had a claim and he said he wasn't satisfied to honor any checks against the account until all of the insurance money had been collected and the claims had been verified or ascertained in some definite way; that he wanted to be sure there was enough to go around, and we didn't come to any agreement with Mr. Bixby. He insisted he would not honor any other checks that were drawn against this account." He further testified that Mr. Bixby said he would not pay any further checks against the account by the United Packing & Preserving Company whether they were on the list or not. Also the following appears in the testimony of Mr. Wilson:

"Q. And what reason did he assign for that? A. He said he wasn't sure there would be enough to go around.

"Q. He said he wasn't sure there would be enough to go around? A. And he said he wanted to wait until all of the insurance money was in and all of the creditors' claims had been made known."

On account of the refusal of Mr. Bixby to pay the Goodloe check, and at his request, the account of the United Packing & Preserving Company was transferred to the Mound City Trust Company about January 28, 1922, and after that, the remainder of the insurance money was paid in to the Mound City Trust Company, and the Goodloe claim was paid, and also settlement made of the claim of the South Side Bank, at fifty cents on the dollar, principal and interest, amounting to $1601.89. Mr. Goodloe himself had presented the check to defendant bank about the 23d or 24th of January, 1922. He said the reason assigned by Mr. Bixby for refusing payment was "that they

had sufficient funds to pay it, but that they declined to do so because it would make me a preferred creditor." The witness said that he then told Mr. Bixby he was not a creditor, but that this was a cash transaction; that it was goods ordered which had not been turned over to the company, and would not be until they received their money. Mr. Goodloe went back the second time and there was a conversation at which, Mr. Rich, Mr. Ruppenthal and Mr. Bixby were present. Mr. Goodloe stated that Rich threatened Ruppenthal, and said, at that time, he was going to start bankruptcy proceedings against him on account of the claim they had. According to the testimony of Mr. Rich, he explained to Mr. Bixby the nature of the accounts receivable held by the Evans-Rich Company as security for the indebtedness due to that company. He says he told Mr. Bixby one of the accounts was upon Klein Brothers for $4,500, and told Mr. Bixby that nothing could be realized on the Klein Brothers' account; that another of the accounts receivable was on E. White Grocery Company for $3,500 and that he did not expect to collect more than fifty percent on that claim. The other accounts held by Evans-Rich Company were small. According to the testimony of Mr. Rich, he saw Mr. Bixby on a number of occasions prior to January 20th, concerning the claim of Evans-Rich Company, in which the affairs of the United Packing & Preserving Company were discussed, and his statement is that almost every time he saw Mr. Bixby he told him that company was insolvent, and he says that one time he went over with Mr. Bixby the figures of the accounts that were payable, and the amount they would get for the insurance, and the value they thought they would get for the salvage, and proved the company insolvent. He further testified that Mr. Bixby admitted to him that the company was insolvent if the Evans-Rich claim was allowed. On cross-examination of Mr. Bixby, there is the following:

"Q. When you received these checks for the amounts that the United Packing Company owed you, you didn't have the slightest doubt that they would be able to pay all of their claims, including Mr. Rich's? A. Mr. Rich's claim was of course in dispute and I do not know that I considered it from that angle, but I thought they could.

"Q. But I am talking also of Mr. Rich's claim. A. Yes, I presumed that the excess would cover his claim.

"Q. And that was your understanding was it—I want to be clear on that—at the time that you were paid that there would be enough money left to pay Mr. Rich in full as he claimed?

"MR. HOCKER: You mean money or assets? A. Well, I didn't say that. We were certain when we accepted payment that there would be assets enough to pay all indebtedness.

"Q. Including Mr. Rich's claim in full as he presented it? A. No, I don't want to say whether I knew that or not."

The testimony given by Mr. Bixby himself and the circumstances show that Mr. Bixby had knowledge that a petition in bankruptcy had been filed against the A. M. Neville Manufacturing Company, which was the same company as the United Packing & Preserving Company; that the money borrowed from his bank had been used in payment of indebtedness to the South Side Bank and other creditors and that payment in full of all the creditors had not been made. It also follows that Mr. Bixby knew the company was in need of working capital. It was through his getting Mr. Ford interested, who was a stockholder in the Evans-Rich Company, that Mr. Ford got Mr. Rich interested, and the contract and arrangement was made between the Evans-Rich Company and the United Packing & Preserving Company, whereby the Evans-Rich Company would furnish the money to buy materials to be put up by the United Company. Since the United Company did its business with defendant bank, the bank officials and Mr. Bixby knew of the extremely small amount of money which the company had in bank, and the statements made in June and in August, to which we have referred, showed also the small amount either in cash or on deposit. He knew of the small deposits and of the overdrafts standing before and after the fire.

The testimony for plaintiff tends to show that after the early part of December, 1921, Mr. Bixby knew that practically all of the accounts receivable of the United Packing & Preserving Company were in the hands of the Evans-Rich Company as security for the advancements made by the latter company for materials; that the United Packing & Preserving Company had little of accounts receivable outside of those in the hands of the Evans-Rich Company; and that he was told by Mr. Rich that fifty per cent or more of the amount of those accounts was uncollectible. Evans-Rich Company did collect the sum of $3,101.50 on the accounts, and the balance due on their claim was $6,017.05, which was the sum allowed by the referee.

Mr. Bixby said in his testimony that he did not know how much the Evans-Rich claim would be reduced by the accounts collected; that at the time payment was received by defendant, he thought there was enough to pay the debts of the company.

The requirements made of the plaintiff in a suit of this kind are stated in Walker v. Wilkinson, 296 Fed. l. c. 852: "To establish a recoverable preference the trustee must show (1) a transfer of property or money to the creditor by the bankrupt, (2) while the bankrupt was insolvent and within four months of bankruptcy; (3) that the creditor had reasonable grounds for believing the bankrupt insolvent at the time he received the transfer; and (4) that the effect

315 Mo.—57.

of the transfer was to give the creditor a greater percentage of his
debt than other creditors of the same class secured."

Counsel for defendant in their brief state the issue immediately
before us, as follows: "The only question to be considered on the de-
murrer is whether or not Mr. Bixby had reasonable grounds to be-
lieve, on January 20, 1922, that the United Packing & Preserving
Company was insolvent, and, consequently, that the payment of the
defendant's debts on that date would result in the defendant obtain-
ing a greater percentage of its debt than other creditors would be
able to obtain from the assets of the company."

There is further to be borne in mind the rule that upon considera-
tion of a demurrer to the evidence, the plaintiff is entitled to have the
evidence in his favor accepted as true, and is also entitled to every
reasonable inference to be drawn therefrom. Another rule applicable
in such a suit is stated in Farmers' State Bank v. Freeman, 249 Fed.
l. c. 583: "Notice of facts, which would incite a person of reasonable
prudence to an inquiry under similar circumstances, is notice of all
the facts which a reasonably diligent inquiry would develop."

The testimony heretofore referred to shows many things calculated
to incite Mr. Bixby to inquiry. In considering the question of what
Mr. Bixby had reasonable grounds to believe as to the solvency of
the United Packing & Preserving Company, and indeed the question
as to whether the company was solvent, we think the Goodloe claim
for the apple chops may be laid aside. The company had not received
them, and since the evidence is that they were worth the amount of the
claim, the one would balance the other. Besides, Mr. Bixby refused
to honor the check for that claim, insisting that the company ought
not take the apple chops, and ought to close up its affairs.

Counsel for defendant in their brief have prepared a statement of
the assets and the liabilities, which they say is as favorable to plaintiff
as his evidence justifies, and which Mr. Bixby could reasonably de-
pend upon. They have listed as assets the following:

Insurance paid ................................$25,673.35
Amount realized by Evans-Rich at the time of the trial
     on the accounts held by that company ......... 3,101.50
The salvage ................................... 7,135.06
                                              _____
Total ........................................$35,909.91

In this they have not mentioned, of course, any value claimed upon
the leasehold, and we think properly so. The lease had only a short
time to run. The accrued rent was paid and the lease abandoned
after the transfer of the account to the Mound City Trust Company.
Counsel call attention to the fact that in this statement of assets they
have not included anything for the Maplewood property, which was
sold under foreclosure in June, 1921, and we think they are correct in

.omitting that, as we find no evidence in the discussions after the fire to show that Mr. Bixby or any one else was considering the Maplewood property or the leasehold as assets of any value. Against the foregoing list of assets, counsel first set off the following liabilities: Defendant's debt, $8,718.33; the amount of debts in the list given to defendant, $6,784.25; the claim of Evans-Rich as allowed, $6,017.05; the Monongah Glass Company claim, $1779.05; also the sums paid to those engaged in adjusting the insurance, amounting to $1410.20. The total of these is, as stated by counsel for defendant, $24.708.88. If that sum be subtracted from the insurance money, only $964.47 remains. Upon this showing they say there were assets in excess of liabilities in the sum of $11,201.03. But, upon the face of the statement, that is $3,101.50 too much. It is clear that counsel cannot list the sum of $3,101.50, realized by Evans-Rich on the accounts as an asset, and at the same time, for the purpose of determining the excess of assets over liabilities, include the Rich claim as a liability at no more than $6,017.05. The latter sum was the liability left after taking the $3,101.50 from the original claim of more than $9,000. The result of this is a reduction of the excess stated. Correcting counsel's statement, we take $3,101.50 from $11,201.03, leaving only $8,099.53 as the excess which could be claimed under that statement, and that is upon the basis that the salvage was of the value of $7,135.06. As we have heretofore related, the evidence tended to show that Mr. Bixby had notice of the claim of the South Side Bank. This claim was for $3,000. It is true it was understood that it was disputed and eventually it was settled for $1601.89. Mr. Bixby also heard the McCandless indebtedness of $1100 discussed. It is not shown that Mr. Bixby's attention was directed to the claim of Jim Anderson Company for $10,000, for which suit had been pending in the circuit court for months. The evidence shows that this claim had been filed with the referee for allowance, but allowance had not, at the time of the trial, been made. It was further shown that pending, or, as a result of depositions taken upon that claim in the later part of the year 1921, there had been an offer on the part of the United Packing & Preserving Company to pay $5,000 if accepted in preserves, and the attorney for Jim Anderson Company had agreed to that, but there had been no settlement made, as the United Company could not furnish the preserves. It also appears Jim Anderson Company would then have settled the claim for $1500 in cash.

If, as counsel for defendant suggest, Mr. Bixby had made inquiry, and thus would have learned that the South Side Bank claim for $3,000 could be settled for $1601.89, and the claim of Jim Anderson Company for $10,000 could have been settled for $1500, this would add the sum of $3,101.89 to the amount of the debts. The sum of the debts which counsel mention in the statement above referred to is

$24,708.88, which, with the added sum of $3,101.89, would make a total of $27,810.77, or a sum $2,137.42 in excess of the amount of the insurance money. This leaves out of consideration the McCandless note, which was not on the list of claims allowed by the referee; leaves out the claim of Julius Muench, not shown to have been called to the attention of Mr. Bixby, but allowed for $487.05; also the claim of the tax collector of $596.77, allowed for taxes, due in the fall of 1922, or, after the payment made to defendant bank; and leaves out certain other small claims afterward allowed by the referee, and not shown to have been mentioned to Mr. Bixby.

The inquiry naturally turns to the value of the assets other than the insurance money, and what Mr. Bixby had good cause to believe was the value of such other assets. Under this head, there was clearly nothing of substantial value, except the salvage from the fire, virtually all of the accounts receivable being held by the Evans-Rich Company, under the contract shown to Mr. Bixby. Upon the question of the value of the salvage, or what Mr. Bixby had good reason to believe it was worth, the evidence is varied. Mr. Bixby did not examine the property after the fire. Mr. Rich had done so, and said it was not worth $1000. He did not testify that he told Mr. Bixby it was of less value than $1000, nor what the value was, except as might be implied from the statement he said he made to Mr. Bixby, that, taking into consideration the salvage and insurance money and the debts he knew of, the company was insolvent.

Mr. Bixby, in his testimony, said that he was keeping informed as to the adjustment of the insurance, and said he had understood the loss was about a ninety per cent loss. However, in the statement of adjustment of the loss signed up on December 7, 1921, introduced in evidence, it appears that the salvage was placed at $6,482.50. There was testimony that the salvage, including the car of apple chops paid for out of the insurance money after the account was moved from defendant bank, was sold for $2,000. The contention is that this sale was fraudulent. There was read in evidence by defendant a verified petition of the referee for permission to sue Ruppenthal and others, for the recovery of assets. It throws some light on transactions occurring after the account was moved from defendant bank to the Mound City Trust Company, but not upon what was known by Mr. Bixby at the time of the payment. Said petition alleged that Ruppenthal and certain others associated with him had conspired together; had sold the assets of the company to one of their number; had afterward organized a new company, capitalized at $8,000, and whose sole assets were the said properties belonging to the United Packing & Preserving Company; that afterward this new company sold the property for $18,000, and the proceeds of the sale were divided between Ruppenthal and his associates, all in fraud of the creditors.

Said petition also alleged that Ruppenthal and his said associates had paid themselves out of the money of the United Packing Company, certain claims of theirs for services aggregating about $1400. It was shown there were other suits by the trustee for the recovery of alleged preferential payments.

Counsel for defendant have cited numerous cases of the Federal courts, and of the courts of appeals of this State, to the effect that a mere suspicion, on the part of a person receiving payment or transfer of property from one afterward adjudged bankrupt, that such payment or transfer will operate as a preference, is not sufficient to sustain an action by the trustee. That much may be conceded. In such cases the rule is applied to the facts in the particular case.

Under the statute as amended in 1910 (36 U. S. Stat. at Large, page 842; U. S. Compiled Stat., sec. 9644) the question is whether the alleged preferred creditor has reasonable cause to believe that a preference would result, and not merely that it might result.

This distinction is pointed out in Sumner v. Parr, 270 Fed. l. c. 676, a case cited by counsel for defendant: "Therefore the defendant's knowledge may be put in this form: There were no immediate suspicious circumstances. Nothing had just happened which should have caused him to suppose that the bankrupt was any nearer insolvency than she had been for some time past. Finding his debtor unable to make ready payments, and knowing that she had substantial property, he became suspicious, and dissatisfied with the delays, and took security. If this charges him with knowledge that the security will create a preference, then so is every creditor who takes security because he has become doubtful and suspicious of the eventual insolvency of his debtor. When the statute requires belief that a preference will result, it means more than this; for the taking of security only shows that the creditor has cause to believe that a preference might result. The two are very different. It may be the difference is only one of degree, but the statute establishes it none the less. In this case the proof goes no further than to show that it might."

In the case at bar there is a different situation from that referred to in that case. In this case the debtor's plant had been practically destroyed by the fire. The testimony is that Ruppenthal insisted that the company could continue in business, and should do so, while McCandless thought its affairs should be closed up. Mr. Bixby says they expressed the opinion that there would be something left after paying the debts. Neither of them testified in this case. It cannot be said there were no circumstances to put Mr. Bixby upon inquiry, and give him cause to believe that the company was insolvent. That he knew or had cause to believe there had been misrepresentation as to the company's indebtedness is beyond doubt. The testimony of witnesses other than himself, and his own testimony, shows that before

the payment was made he had ceased to rely upon the statements of Ruppenthal as to what the company owed. The claims which the evidence tends to show were called to his attention, exceeded the amount of insurance which he knew was to be paid. The salvage was open to inquiry. According to the testimony of Mr. Rich, Mr. Bixby was told what Rich himself knew as to the accounts receivable. Mr. Rich's statement that he thought the assets sufficient to pay the debts is not conclusive. It is to be considered with his other statements. The question is what he, as a prudent person, had reasonable cause to believe under the conditions known to him, or reasonably subject to inquiry by him.

We conclude there is in the record substantial evidence tending to show that Mr. Bixby had reasonable cause to believe on January 20, 1922, that the company was insolvent, and that the payment then accepted would effect a preference, and the question was one for the jury.

The other errors assigned are directed to plaintiff's Instruction 1 as offered, and as modified and given by the court, and to defendant's Instruction 2 as offered and as modified and given, over objections. We set out these instructions in their modified form as they appear in the abstract, the words stricken out of the original being shown by brackets, and the interpolations made being shown by the words underscored.

"1. The court instructs the jury that under the National Bankruptcy Law if a bankrupt makes a transfer of any of his property, and if at the time of such transfer and being within four months before the filing of the petition in bankruptcy [or after the filing thereof and before the adjudication], the bankrupt be insolvent and such transfer then operates as a preference and the person receiving it or to be benefited thereby, or his agent acting therein, shall have reasonable cause to believe that such transfer would effect a preference, it shall be voidable by the trustee in bankruptcy and he may recover the property or its value of such person.

"The court further instructs you that if you find and believe from the evidence that on the 28th day of February, 1922, the involuntary petition in bankruptcy, *offered in evidence,* was filed by the Evans-Rich Manufacturing Company against the United Packing & Preserving Company in the United States District Court for the Eastern Division of the Eastern Judicial District of Missouri, and that thereafter, on the 23d day of June, 1922, the United Packing & Preserving Company was duly adjudged a bankrupt in the United States District Court in said cause, and that thereafter the plaintiff in this cause was duly elected and qualified as trustee in bankruptcy of said company and gave bond and since said time has been acting as such trustee in bankruptcy; *that various claims have been proved by credi-*

tors, *if any, and allowed by the referee in bankruptcy before whom the same is pending,* and that there is no money or property in said bankrupt estate with which to pay the *said* proven and allowed claims, *if any,* therein.

"And if you further find and believe from the evidence that on the 20th day of January, 1922, the United Packing & Preserving Company was indebted to the defendant State National Bank on a note in the sum of $8,250 and on an overdraft in the sum of $338.41 and on an interest account in the sum of $129.92, making a total of $8,718.33, and on said date the United Packing & Preserving Company paid to the defendant said sum of $8,718.33 in full and complete payment of said indebtedness.

"And if you further find and believe from the evidence that at the time said payment was made on the 20th day of January, 1922 (if you find from the evidence that it was made on said date)`, that the defendant, through its officer or agent Bixby, had reasonable cause to believe that said company was insolvent and that said payment would effect a preference in favor of said State National Bank and would enable the State National Bank to obtain a greater percentage of its debt than other creditors, then your verdict (should) be in favor of the plaintiff for the sum of $8,718.33. . . .

"2.   The court instructs the jury that before you can find for the plaintiff in this case, you must believe and find from *the greater weight and preponderance of* the evidence [(1) that the effect of the payment to the defendant was to secure the defendant a greater percentage of its debt than other creditors of the United Packing & Preserving Company might obtain from the estate of said bankrupt, and (2)] that the defendant by its officers and agents, when it received [such preference] *payment of its debt* knew, or had reasonable cause to believe, that [said company] *the United Packing & Preserving Company,* was insolvent and that such payment would enable the defendant to obtain a preference over other creditors of said company."

The objection made to the instruction for plaintiff is, that whereas the only issue which needed to have been submitted to the jury was whether or not Mr. Bixby knew, or ought to have known, that the bankrupt company was insolvent, on January 20, 1922, the instruction unnecessarily submits seven issues as having been controverted in the case. These are (1) whether the involuntary petition in bankruptcy was filed, (2) whether the United Packing & Preserving Company was adjudged bankrupt, (3) whether plaintiff was elected and qualified as trustee, (4) whether claims were allowed by the referee against the estate, (5) whether the company was indebted to the de-·fendant, (6) whether the company was insolvent on January 20, 1922,

(7) whether the defendant was paid the sum of $8,718.33 in full satisfaction of its debt.

Counsel concede that in many cases the submission of admitted facts is harmless error. But it is urged that because the verdict in this case was not a unanimous verdict, and was contrary to the evidence, it cannot be said here that this error was harmless. Without going into detail as to what is shown by the record to have been admitted, it does appear that there were objections made by counsel for defendant upon the admissibility of a number of the documents relating to the matters foregoing, and to their contents and the relevancy of their contents, and there were various colloquies between the respective counsel and with the court also as to what was admitted and what was not admitted. There was not an unqualified admission of all those matters.

The evidence as to some of them was offered in such a form, and the objections thereto were so stated, and the admissions made so far qualified, as to tend to confusion in determining what was admitted and what was not. As an example, insolvency of the United Packing & Preserving Company on January 20, 1922, was not admitted, nor that defendant was paid the alleged preference on that day, but it was admitted that the *findings* of the referee in bankruptcy to whom the matter was referred as special master by the United States District Court, were, that said company was at the time mentioned insolvent, and that the alleged preference was paid on the day mentioned. The instruction submitted for finding, by the jury, various things which could have been avoided and ought to have been avoided. But under all the circumstances we do not hold there was reversible error in submitting the particular questions referred to.

The other objection goes to modification by the court of defendant's Instruction 2, and to the point that under the instructions, as given, there was no proper definition nor guide to the jury as to what constituted a preference, and that, because of the peculiar facts in the case, the jury was confused and misled. The defendant excepted to the refusal of its Instruction 2 as offered, and to its modification, and to the giving of the instruction as modified by the court. As so given, it was the court's instruction and not an instruction offered by defendant. That was the independent and disconnected act of the court. [Maxey v. Metropolitan St. Ry. Co., 95 Mo. App. 303.] The real issue was as urged by counsel for defendant, whether defendant knew or had reasonable cause to believe the payment accepted by it would effect a preference, within the meaning of the bankruptcy law. Neither side offered a separate instruction undertaking to define specifically the word "preference," as used in the statute. A statutory word having a technical meaning should be defined by the court. [Ampleman v. Citizens' Ins. Co., 35 Mo. App. 308.] Words of that

character when used in instructions should have their meaning clearly defined. [Turnbow v. Dunham, 272 Mo. 53; 38 Cyc. 1686-88.]

But, it is also the rule in civil cases that a party desiring a definition to be given of a technical word or expression, must ask an instruction to that effect, and cannot complain if he has not asked that such word or expression be defined. [Quirk v. St. Louis United Elevator Co., 126 Mo. 279; Johnson v. Ry. Co., 96 Mo. 340; Crapson v. Wallace, 81 Mo. App. 680; Norris v. Railway, 239 Mo. 695.] The rule has also been announced many times that it is not error to refuse an instruction which is but a substantial repetition of others given; or, where the charge of the court to the jury in other instructions presents every element disclosed by the evidence which the party litigant is entitled to have submitted to the jury, he cannot complain that an instruction embodying the same propositions has been refused. [State v. Moore, 101 Mo. 316; Britton v. St. Louis, 120 Mo. 437; Naylor v. Cox, 114 Mo. 232; Kansas City Suburban Belt Railway v. McElroy, 161 Mo. 584; Impkamp v. St. Louis Transit Co., 108 Mo. App. 655.]

Plaintiff's Instruction 1 begins by stating in a general way the conditions under which a trustee in bankruptcy may recover money paid, and alleged to constitute a preference. After submitting various preliminary issues, it authorized a finding for plaintiff if defendant at the time the payment was made, "had reasonable cause to believe that said company was insolvent, and that said payment would effect a preference in favor of said State National Bank and enable the State National Bank to obtain a greater percentage of its debt than other creditors."

Taking this with the other parts of the same instruction we think the jury was fairly advised as to what constituted a preference. Counsel for defendant say it is insufficient because, after the words, "a greater percentage of its debt than other creditors," it does not add the words, "from the estate of the bankrupt." But, we do not conceive how the jury could have failed to understand clearly that the only creditors concerned were the creditors of the bankrupt company, and that the only estate or source from which they were to be paid was the estate of the bankrupt company. The could not fail to understand that the insurance money, the salvage, and the accounts receivable were all parts of the estate of the bankrupt. The complaint of counsel for defendant as to Instruction 2, as modified and given by the court of its own motion, is that it left out the first clause of the instruction as it was offered, which they say contained the only correct definition of the word "preference." We think it adds nothing material to what is contained in Instruction 1. The only instruction authorizing the plaintiff to recover was Instruction 1, as modified. Defendant only asked two instructions other than Instruction 2. These were given. Defendant's Instruction 3 told the jury

that facts creating a mere suspicion on the part of defendant that the United Packing & Preserving Company was insolvent on January 20, 1922, was not sufficient to invalidate the payment, but that defendant's officers must have had such a knowledge of the facts as would induce a reasonable belief of such insolvency at the time of said payment.    Instruction 4 defined insolvency.

What was said by the St. Louis Court of Appeals in Cox v. Granite Co., 39 Mo. App. l. c. 432, is applicable:

"The question in this case is not whether the instructions refused presented proper propositions of law applicable to the evidence, but whether they were embodied in the charge given by the court to the jury.    Both the Supreme Court and this court have frequently decided that such is the true test in determining whether error has been committed in the refusal of instructions.    Where the charge of the court to the jury, as in this case, is unobjectionable, and presents every element presented by the evidence, which the defendant is entitled to have submitted to the jury, the defendant cannot complain that instructions asked by him, embodying the same propositions in a different form, have been refused.    We deem it preferable that the court should, in every case, place before the jury the law applicable to the facts in one connected charge, instead of giving disconnected declarations at the instance of the respective parties, and let the jury find out, as best they may, the relative application of the disconnected law to the disconnected facts."

In view of foregoing, we conclude that the judgment herein should be affirmed.  *Seddon, C.,* concurs.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court.    All of the judges concur, except *Graves, J.,* absent.