223 F.Supp. 512 (1963)
In the Matter of John D. SCHINDLER, d/b/a Circle "S" Farm and Schindler Feed & Fertilizer Store, Bankrupt.
No. 61 B 336(1).
United States District Court E. D. Missouri, E. D.
October 9, 1963.
*513 *514 *515 Ralph L. Alexander, Columbia, Mo., William H. Armstrong, St. Louis, Mo., for bankrupt.
Everett S. VanMatre, Mexico, Mo., for trustee.
Terence C. Porter, Welliver, Porter & Cleaveland, Columbia, Mo., for American Nat. Bank & Trust Co. of Chicago, Ill., appellant.
HARPER, Chief Judge.
Memorandum opinion on the petition of American National Bank and Trust Company of Chicago and First National Bank of Centralia to establish liens on *516 assets and on said respective secured Claims Nos. 45 and 56 filed by the Referee in Bankruptcy on April 17, 1963, is hereby adopted as the findings of fact and conclusions of law of the court, and the orders of the Referee are in all respects confirmed.
The opinion of O'Herin, Referee, follows:
On September 6, 1961, American National Bank and Trust Company of Chicago filed a secured claim herein, designated as Claim No. 45, in the principal amount of $38,430.97 and interest of $496.63 as of March 13, 1961, the date of Bankruptcy, the security being a deed of trust on bankrupt's farm and a chattel mortgage on growing wheat thereon. On the same day the bank filed a petition to establish a lien on assets of this estate, based upon the same deed of trust and chattel mortgage.
On September 26, 1961, First National Bank, Centralia, Missouri, filed a second amended secured claim, which is designated as Claim No. 56, based upon certain notes of bankrupt, secured by assignment of life insurance policies and a deed of trust on bankrupt's farm. That same day it filed a petition to establish a lien on assets herein, based upon the deed of trust.
The assignments of life insurance policies were valid liens, and the bank having realized thereon prior to the date of this trial, the validity of the lien of the bank's deed of trust is the only security issue here presented as to the Centralia Bank.
From the complicated computation of the amount owing on this claim, contained in the allegations therein and testimony (Tr. p. 29), it appears that the amount presently claimed is $6,682.55 and interest.
The farm, with the growing wheat thereon, was sold by the trustee in bankruptcy for $425,000.00, subject to a first deed of trust of the Equitable Life Assurance Society of the United States with balance due of $318,666.11, and the liens of the chattel mortgage on the growing wheat and the deed of trust held by the banks (explanation of this deed of trust securing notes to the respective banks appears hereinafter) were transferred to the proceeds of sale, the validity thereof to be later determined herein. By agreement of the parties, $12,000.00 of the sale price was allocated as the proceeds to which the lien of the chattel mortgage on the wheat should be transferred. The net realization from the sale was $106,333.89, so the assets are sufficient to pay the claims in full, if the liens be valid.
Trustee challenges the validity of the crop mortgage, the validity of the notes and deed of trust securing same and asserts that in any event the latter constituted preferential transfers, the details of which objections will hereinafter appear.
As the facts on the issue of preferential transfer are in large measure common to both claims, and the business transactions between bankrupt and the two banks intermingled, by agreement of the parties and with approval of the Court, the claims and petitions were consolidated for the purpose of the trial. The matters were heard upon a stipulation of fact (Banks' Ex. 8), oral testimony at the trial, and by depositions. In those instances where exhibits were offered jointly by claimants, such are marked "Banks Exhibit", otherwise the exhibits are identified by the name of the offeror.
The facts giving rise to the present controversies are found to be as follows: John D. Schindler, bankrupt herein, owned and operated a farm of approximately 2,000 acres in Audrain County, Missouri. On March 13, 1961, he filed a voluntary bankruptcy petition initiating this proceeding. For several years prior thereto he had conducted his banking business with the First National Bank of Centralia, Missouri. Three accounts were maintained at the bank. One was a joint account in the names of bankrupt and his wife, which was the farm operating account and in which most of his money was handled. Another account was the John D. Schindler Feed and *517 Fertilizer account, which account was for a feed and fertilizer store bankrupt operated in town. The third account was in the name of Catherine Schindler, bankrupt's wife.
During this period of time he made loans from this bank for the farm operation. This operation was too large for the Centralia Bank to handle alone, so it arranged with its correspondent bank, American National Bank & Trust Company of Chicago, to handle the loans. The financing was done by notes secured by chattel mortgages on crops and livestock. The practice was that the notes and chattel mortgages were in the first instance made to the Centralia Bank, and assigned by it to the Chicago Bank without recourse.
The first loan made by the American National was November 30, 1959, (Amer. Natl. Bank Ex. 8). There followed a number of loans. On September 2, 1960, Schindler owed this bank $102,263.74 (Amer. Natl. Bank Ex. 8) secured by chattel mortgages on crops and livestock.
In September and October, 1960, bankrupt sold soy beans, corn, lamb wool and hogs, which were mortgaged. See depositions of L. W. Angell, Wendell C. Mustain and Ward Truesdell (Banks' Exhibits 9, 13, 15) and testimony of Albert Craig (Tr. p. 114 et seq.).
Truman Garrison was an appraiser for the Centralia Bank and a director thereof (Tr. p. 58). On March, 1960, he was employed by the American National Bank to make appraisals of bankrupt's livestock and crops. He made such an appraisal July 29, 1960, (Banks' Ex. 17).
On October 6, 1960, he made another appraisal (Banks' Ex. 18). This appraisal showed a decrease in crop items of $21,805.00 from the appraisal of July 29th. The largest item of the discrepancy was $10,000.00 worth of soy beans. He notified both Harry Jennings, then President of the Centralia Bank, and the American National Bank, of the facts disclosed by the appraisal of October 6th. (Tr. p. 79 et seq.).
Jennings wrote the American National Bank about the matter. As a result Everett Dovale, Assistant Vice President of the American National Bank, came from Chicago to Centralia. (Tr. p. 53).
On October 20, 1960, a conference was held with bankrupt at the Centralia Bank. Present, beside bankrupt, were Jennings, Dovale and Garrison. At the insistence of the banks, bankrupt executed Trustee's Ex. A. This is in the form of a letter dictated by Dovale and typed in the Centralia Bank office. (Tr. pp. 56, 74, 142). It is dated October 20, 1960, addressed to Harry Jennings, First National Bank, Centralia. It states that in connection with notes totaling $102,263.74 "made to your bank and assigned to the American National Bank and Trust Company of Chicago, I wish to make the following statement and agreements:".
The agreements bankrupt then made were that "the bank" was to be represented by Garrison, who would employ two picker-shellers; bankrupt to use his picker-sheller and his equipment to pick and shell his entire corn crop. Garrison was to sell the oats, hay milo, and the livestock except lambs, which were to be kept thirty days, and it then be determined if such were to be kept longer. Proceeds of the sales were to be placed in an escrow account at the First National Bank, Centralia. Wages for harvesting the corn were to be paid by Garrison from the escrow account.
Bankrupt further agreed that after the entire liquidation was completed, should there be a deficit, bankrupt would execute a note and deed of trust on his entire farm to the American National Bank and Trust Company, for "a like sum including interest". Bankrupt further agreed therein to execute a chattel mortgage "to the bank" on 230 acres of growing wheat on his farm.
The accounting of Garrison's liquidation appears in Banks' Ex. 19. It shows the first sale on October 25, 1960, and the last (2 lambs) on February 17, 1961. There is one last item "stalk field $100.00" on April 7, 1961. Further reference will hereinafter be made to this exhibit.
*518 The chattel mortgages under which the bank claimed a lien on the proceeds of the foregoing liquidation are American National Bank's Exhibits 9, 10 and 11. Each mortgage provides it shall secure the renewal of any note therein mentioned and each contains a future advances clause. Under Missouri Law a chattel mortgage may be given to secure future advances. Foster v. Reynolds, 38 Mo. 553; Smith-Wallace Shoe Company v. Wilson, 63 Mo.App. 326, 330; Rice v. Davis, 99 Mo.App. 636, 74 S.W. 431; Jacques v. Goggin, 362 Mo. 1005, 245 S.W.2d 904. Also, as will be noted from authorities hereinafter cited in connection with the wheat crop mortgage, an antecedent debt is sufficient consideration for a chattel mortgage.
These three chattel mortgages were executed June 16th, August 4th and August 26th, 1960. Two covered various livestock and crops, the third covered lambs only. They were promptly and properly filed in Audrain County, Missouri, the residence of bankrupt at all times here material. They were held by the American National Bank as security for bankrupt's notes assigned to it by the Centralia Bank, without recourse.
Three of the notes so secured are American National Bank's Exhibits 2, 4 and 5, executed in April, June and July, 1960, aggregating $55,000.00. In addition the American National, as shown by its Exhibit 8, held other notes of bankrupt at the time of the liquidation, some later in date than the chattel mortgages, but all secured thereby.
After allowing certain credits from the liquidation, the bank took bankrupt's note for $45,163.76 on January 3, 1961, representing his then indebtedness to the bank. This is American National's Ex. 1, upon which the claim is based. Said Bank's Exhibits 2, 4 and 5 were retained by the bank and are the three notes referred to in the claim as worthless collateral to Exhibit 1.

The Wheat Crop Chattel Mortgage
In accordance with his agreement of October 20, 1960, (Trustee's Ex. A) bankrupt executed a chattel mortgage on 230 acres of growing wheat. (Amer. Natl. Bank Ex. 6). This chattel mortgage is undated. It was filed for record in Audrain County, Missouri, on November 2, 1960.
At the outset it is to be noted that the recording date being more than four months prior to bankruptcy, the giving of this chattel mortgage did not constitute a preferential transfer under Section 60 of the Bankruptcy Act. Nor is there any evidence showing such to be a fraudulent conveyance.
Upon the offer of this exhibit in evidence (Tr. p. 132) trustee objected upon the grounds that it failed to show the date of execution; that there was no showing it had been assigned to American National Bank; that the exhibit did not show it to be security for any existing indebtedness or any future indebtedness and that it lacked adequate description of the mortgaged property to make same effective under Missouri Law. The exhibit was received, subject to this objection.
This chattel mortgage is a printed form filled out by typewriting. It is, as above noted, undated. It states that John D. Schindler of Audrain County, Missouri, sells, assigns, transfers and sets over to the mortgagees (identified in the mortgage as First National Bank of Centralia, Missouri) "the following described personal property, to-wit:
Two hundred thirty (230) acres of wheat now growing on my farm North and West of Centralia, Missouri".
The mortgage further provides that "the above described property * * * is now located and to remain at or on my farm in Audrain County".
The space on the form for recitation of the consideration is left blank. In the space provided for description of the mortgaged property, and below the above quoted description, appears the following:
"This chattel taken as additional security on all loans assigned to American *519 National Bank & Trust Company, Chicago, Ill. now totaling App. $102,263.74"
No assignment is endorsed on the chattel mortgage. On November 3, 1960, Jennings, President of the Centralia Bank, wrote Dovale, Assistant Vice President of American National Bank & Trust Company, a letter stating he was enclosing a chattel mortgage, covering 230 acres of wheat on the John D. Schindler farm. (Amer. Natl. Bank Ex. 14).
It may be here noted that in the brief of American National Bank, in support of the validity of this chattel mortgage, it is stated to be well established that any chattel mortgage valid against the bankrupt is valid against the trustee in bankruptcy, as the latter is not a bona fide purchaser. This is not the law.
It is true that a trustee in bankruptcy is not a bona fide purchaser. However, under the so called "strong arm clause" of the Bankruptcy Act, being Section 70, sub. c, the trustee, as to all property of the bankrupt, is vested, as of the date of bankruptcy, with the rights, remedies and powers of a creditor then holding a lien thereon obtained by legal or equitable proceedings, whether or not such a creditor actually exists. By virtue of this section of the Bankruptcy Act, an unfiled chattel mortgage, valid as between the parties, but invalid against any creditor acquiring a lien by judicial proceedings, under the provisions of V.A.M.S. Sec. 443.460 as Amended Laws 1959, is invalid as against a trustee in bankruptcy. This is likewise true as to a chattel mortgage invalid against third parties by reason of insufficient description of the mortgaged property.
As to the objection that the mortgage is undated, as noted hereinabove, it was filed November 2nd and such is its effective date. There was testimony that it was executed in November, 1960. (Tr. p. 154).
The contention that it was given without consideration is without merit. An antecedent debt is sufficient consideration for giving of a chattel mortgage. Splint v. Sullivan, 58 Mo.App. 582; Sikes v. Riga, 221 Mo.App. 152, 297 S.W. 727, 729; Hale v. Hummel, 64 F.2d 210 (C.C.A.Mo.). Such is the general rule. In re Pilot Radio & Tube Corp., D.C., 5 F.Supp. 453, affirmed 1 Cir., 72 F.2d 316, cer. den. Eckhardt v. Ball, 293 U.S. 584, 55 S.Ct. 98, 79 L.Ed. 680. And where a chattel mortgage based upon such a consideration is filed for record before levy, it is valid against the attaching creditor. Sikes v. Riga, 221 Mo.App. 152, 297 S.W. 727.
Trustee further contends that there was no consideration for the chattel mortgage as such was not given to secure any debt owed the named mortgagee, First National Bank of Centralia. As hereinabove noted, the chattel mortgage shows on its face that it was given as additional security on the loans assigned to American National Bank. Creditors could not be misled as to the purpose for which it was given.
Under Missouri Law a contract may be made for the benefit of a third party. Handlan-Buck Company v. State Highway Commission, 315 S.W.2d 219 (Mo.Sup.); United States v. Scott, 167 F.2d 301 (C.A.Mo.). A chattel mortgage may be given to one person for the benefit of another. 10 Amer.Jur.Chattel Mortgages par. 9, page 743; In re Babb, 41 F.2d 253; Petition of Jackson, 6 Cir., 18 F.2d 462; In re Thomas, 199 F. 214, 230; In re Pilot Radio & Tube Corporation, D.C., 5 F.Supp. 453, affirmed 1 Cir., 72 F.2d 316, cer. den. 293 U.S. 584, 55 S. Ct. 98, 79 L.Ed. 680; Chafey v. Mathews, 104 Mich. 103, 62 N.W. 141, 27 L.R.A. 558.
The fact that the chattel mortgage itself bears no endorsement or assignment does not render it ineffective. It is not necessary that the chattel mortgage itself be assigned and the assignee of the notes, which constitute the debt for which it was given as security, may enforce the mortgage. Kingsland & Ferguson Mfg. Co. v. Chrisman, 28 Mo.App. 308; Kingsland & Douglas Mfg. Co. v. *520 Board Brothers, 60 Mo.App. 662, 666, 667; Green v. Powell, 46 S.W.2d 915, 919 (Mo.App.); Universal C. I. T. Credit Corp. v. Fullerton, 249 S.W.2d 175, 178 (Mo.App.).
The objection that the mortgaged property is insufficiently described is not well taken. Under Missouri Law a description of chattels mortgaged is sufficient as "constructive notice" if a third person with the aid of the description and by the inquiries which the instrument reasonably suggests, can identify the mortgaged property. Tobin v. Kampe, 132 F.2d 64, 145 A.L.R. 366 (C.C.A.Mo.).
In this chattel mortgage the mortgagor is identified as John D. Schindler of Audrain County, Missouri; the mortgaged property is described as 230 acres of growing wheat located on his farm in Audrain County, North and West of Centralia, Missouri. The evidence here shows (Tr. pp. 163 et seq.) that prior to execution of the chattel mortgage, Schindler had sown 230 acres of wheat; that this 230 acres of wheat was the only wheat on the farm and he had only the one farm in Audrain County, Missouri. The description is sufficient as constructive notice to third parties. Mayer v. Keith, 55 Mo.App. 157, 162; Cook v. Wheeler, 218 S.W. 929 (Mo.App.).
Having been executed and properly filed of record more than four months prior to bankruptcy, it constitutes a valid lien on the $12,000.00 proceeds of the mortgaged wheat, in favor of the American National Bank, and said bank is entitled to payment of that amount on its claim.

The Deed of Trust and Two Notes Secured
On November 17, 1960, bankrupt and Catherine W. Schindler, his wife, signed and acknowledged a deed of trust covering the farm in Audrain County, Missouri, hereinbefore mentioned as having been sold by the trustee in bankruptcy.
It is a second deed of trust, being by its terms subject to the prior deed of trust to Equitable Life. The trustee is Ralph L. Alexander (bankrupt's attorney of record in this case) and the cestuis que trust are "Ourselves". It was recorded in Audrain County, Missouri, November 21, 1960. The deed of trust is identified in this record as First National Bank's Ex. 4c and American National Bank's Ex. 12. By its terms it was executed to secure two promissory notes dated November 17, 1960, signed by the Schindlers as makers, each payable to the order of "Ourselves", one in the amount of $125,000.00 and the second for $25,000.00.
The $125,000.00 note is American National Bank Ex. 3. The $25,000.00 note is First National Bank Ex. 4a. Both notes are endorsed by the makers and are shown to have been identified by the recorder as the notes described in the deed of trust, at the time of the recording November 21, 1960. Both notes are payable on demand.
The acknowledgements to the deed of trust were taken at the Centralia Bank, the Notary being B. J. Billeter, Executive Vice-President of that Bank. He testified he had no conversation with the Schindlers about the matter; he merely came in and took the acknowledgements; that Mr. Jennings, President of the Bank, talked to them. (Deposition B. J. Billeter Bank's Ex. 10, pp. 29, 30).
Jennings testified that subsequent to the execution of the agreement of October 20, 1960, (Trustee's Ex. A), he had discussed with Schindler the possibility of a deficiency after the liquidation and, of course, Schindler wanted the bank to be secured and agreed to give a second mortgage on his farm as additional security. When asked if the bank was allowed to take a second deed of trust as security, he answered it could under a collateral agreement on debts previously contracted. (Tr. p. 56).
John Schindler, bankrupt, testified (Tr. p. 160 et seq.) the two notes and deed of trust were drawn in the office of his attorney, Ralph Alexander, at Columbia, Missouri; that it was his then intention to offer and deliver the $25,000.00 note to the First National Bank, Centralia, *521 and the $125,000.00 note to the American National Bank and the deed of trust was to secure the notes; that he and his wife endorsed the notes on the back, either the day they signed the notes or within the next day or so.
Under the same date of the notes and deed of trust, November 17, 1960, bankrupt and his wife executed two collateral agreements. One is with the American Bank & Trust Company (Amer. Natl. Bank Ex. 7), which by its terms, as collateral security for certain notes of bankrupt described, assigns and delivers to the bank a $125,000.00 note, payable to the order of "Ourselves" dated "November 16, 1960", secured by a second deed of trust "against" real estate in Audrain County, Missouri.
The other is with First National Bank of Centralia (First National Bank Ex. 4B), which assigns and delivers to the bank, as collateral security for certain notes of bankrupt described, a $25,000.00 note dated "November 16, 1960" payable to the order of "Ourselves", secured by a second deed of trust "against said" real estate in Audrain County.
Otherwise the terms of the agreements are identical. The only provision here material, aside from those above set forth, is that the collateral security assigned covers then existing and future indebtedness.
Trustee's objections to the banks' claims allege that the notes and deed of trust created no obligation or security at the time of execution, and that bankrupt and his wife being the owners of the fee in the realty, the deed of trust to a trustee for their own benefit resulted in a merger of estates. The objection was further made, as hereinbefore noted, that such constituted preferential transfers under the Bankruptcy Act.
At common law a note may be payable to the makers order, but it is not complete or legally effective until endorsed. Muldrow v. Caldwell, 7 Mo. 563; Aull v. Lee, 61 Mo. 160, 163; Market & Fulton National Bank v. Ettenson's Estate, 172 Mo.App. 404, 158 S.W. 448, 450; 7 Am.Jur. Bills and Notes par. 90, page 837; 10 C.J.S. Bills and Notes § 127, page 576.
This rule has been codified by the Missouri Negotiable Instrument Act. Section 401.008 Missouri Revised Statutes 1949, V.A.M.S., provides a negotiable instrument may be drawn payable to the order of the drawer or maker. Section 401.184 of said Act provides that a note drawn to the maker's own order is not complete until endorsed by him.
It is true that at the time of the execution of the two notes in question payable to the order of "Ourselves", such were not completed, legal obligations. But upon endorsement by bankrupt and his wife, and delivery and assignment thereof as collateral security to the respective banks, such became legal obligations, which in turn were secured by the second deed of trust. As to the latter instrument, the legal title to the realty was outstanding in the trustee, in trust for the banks after the negotiation of the two notes, and there is no element of a merger of estates involved.

Preferential Transfer
Trustee's contention that the execution of the two notes and the deed of trust securing same and assignment of such as collateral security to the banks constituted preferential transfers to the banks is based on Section 60 of the Bankruptcy Act. (11 U.S.C. § 96).
Section 60, sub. a(1) of the Act provides:
"A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."
*522 Section 60, sub. a (2) as to a transfer of real property provides:
"A transfer of real property shall be deemed to have been made or suffered when it became so far perfected that no subsequent bona fide purchase from the debtor could create rights in such property superior to the rights of the transferee."
Section 60, sub. b of the Act provides:
"Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent."
The lien of the deed of trust was, under Missouri Law, perfected so that no subsequent bona fide purchaser could obtain rights in the real estate superior thereto, when it was recorded November 21, 1960. Under Sec. 60, sub. a(2) of the Act, this was the transfer date. Thus the transfer was made within four months of the filing of the bankruptcy petition on March 13, 1961.
As to American National Bank & Trust Company, the transfer was entirely on account of an antecedent debt, as there were no future advances made by this bank.
As to First National Bank of Centralia, the facts are somewhat different. The collateral agreement (First National Bank Ex. 4B) shows that the $25,000.00 note secured by the deed of trust was assigned as collateral security for three of bankrupt's notes. These were made on the following dates and in the amounts stated: December 19, 1959$6,000.00; October 8, 1960$952.27; May 27, 1960  $4,500.00. These were antecedent debts.
On November 19, 1960, bankrupt executed a demand note to the bank for $1,000.00. (First National Bank Ex. 1-E). Under that date the bank issued a deposit slip, representing proceeds of this loan, crediting the account of Catherine W. Schindler with $1,000.00. (First National Bank Exhibit 1-J). The deposit slip bears the notation, "John D. Schindler will sign checks on this account." This was in the handwriting of B. J. Billiter, Executive Vice-President of the Bank, who handled the transaction. He testified he did not remember the circumstances as to why the credit was given bankrupt's wife's account, but it must have been on bankrupt's instructions. (Billiter Deposition. Bank's Ex. 10, pp. 20, 26 et seq.). The bank's ledger sheet of the Catherine Schindler account (First National Bank Ex. 1-I) shows the $1,000.00 as a deposit on November 19, 1960. This was a debt of bankrupt on November 19, 1960, and on the transfer date November 21, 1960, it was an antecedent debt. National City Bank of New York v. Hotchkiss, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115; In re Great Lakes Lumber Company, D.C., 8 F.2d 96; Security Trust & Sav. Bank v. William R. Staats Company, 9 Cir., 233 F. 514, appeal dismissed 243 U.S. 121, 37 S.Ct. 336, 61 L.Ed. 632.
First National Bank's Exhibits 1-B, 1-C and 1-D are the three notes mentioned in the collateral agreement. On January 16, 1961, the balances due on these three notes were consolidated with that of the $1,000.00 note (First National Bank's Ex. 1-E) and a renewal note given by bankrupt that day in the amount of $13,500.00, which is First National Bank's Ex. 1-A, and one of two notes on which the bank's claim is based. At that time the total balance due on the four notes renewed was $12,864.32 (Tr. pp. 13, 14, 78). This transaction also appears in the bank's ledger of the account of Mrs. Catherine Schindler (First National Bank Ex. 1-H). This shows a deposit credited January 16, 1961, of $13,500.00 and a withdrawal that same day of $12,864.32. This would leave a credit balance of $635.68, referred to in the testimony as "new money". (Tr. p. 78).
On February 14, 1961, bankrupt executed a note payable to First National Bank, Centralia, in the amount of $400.00 due March 1, 1961. (First National Bank *523 Ex. 2-A). This is the second note upon which this bank's claim is based.
This $400.00 was credited in the bank's ledger of Catherine Schindler's account under date of February 14, 1961. (First National Bank's Ex. 1-H). A deposit ticket for said sum was issued that same day in the name of Catherine W. Schindler. (First National Bank's Ex. 2-B). This $400.00 is likewise referred to as "new money". (Tr. p. 78).
The collateral agreement (First National Bank's Ex. 4-B) provided that the note secured by the deed of trust was assigned as collateral security for future indebtedness incurred. The $635.68 credit balance (new money) of January 16, 1961, and the $400.00 item of February 14, 1961, come within this clause, are secured by the deed of trust and the bank has a lien therefor.
The $13,500.00 note of January 16, 1961, represents antecedent indebtedness, except as to the then advancement of $635.68.
The fact that the transfer of November 21, 1960, was to secure subsequent advances, as well as antecedent debts, does not deprive the transfer of its preferential character to the extent of the security applicable to pre-existing debts. Stedman v. Bank of Monroe, 117 F. 237 (C.C.A. 8th); Brush v. Seymore, D.C., 30 F.Supp. 202, 204; Lowenstein v. Salop, 55 F.2d 889 (C.C.A.2d); City National Bank of Greenville v. Bruce, 109 F. 69 (C.C.A. 4th).

Insolvency
The next question is, was bankrupt insolvent on November 21, 1960, the date the alleged preferential transfer was made?
Section 1(19) of the Bankruptcy Act (11 U.S.C. § 1(19)) provides that a person shall be deemed insolvent whenever the aggregate of his property shall not at a fair valuation be sufficient in amount to pay his debts.
In the stipulation of facts (Banks' Ex. 8) it is agreed that on November 21, 1960, bankrupt's total indebtedness was $514,105.07. As to assets, it was stipulated that certain items enumerated were of the value there stated, which aggregated $55,664.08.
It was further stipulated that in addition to the foregoing assets, bankrupt was on November 21, 1960, the owner of the hereinbefore mentioned farm, and certain livestock, crops, grain and seeds, the amount and value of which would be a matter of proof in the present hearing.
The above personal property, subject to proof of value, was all disposed of in the liquidation by T. C. Garrison, under the agreement of October 20, 1960. (Trustee's Ex. A). The result of this liquidation, as shown by Garrison's testimony, (Tr. p. 84 et seq.), and the itemized account thereof (Banks' Ex. 19), constitutes the evidence of valuation of this personal property. Garrison testified that after November 21, 1960, he sold livestock and crops in the amount of $36,583.79. At the request of banks' counsel, he wrote this figure in on Banks' Ex. 16. (Tr. p. 96). This exhibit is a balance sheet of bankrupt made by banks' counsel during the trial, based on the stipulation and testimony. Garrison expressed the opinion that he received the fair market price for the sales made. (Tr. p. 101).
Garrison was recalled for further cross-examination by trustee's counsel. (Tr. p. 172 et seq.). It then developed that the figure of $36,583.79 was the amount received for the livestock and crops without any consideration being given to the expense of getting the crops out of the field and to the market, mill or elevator, or any expense of maintaining and marketing the livestock; that the credit given bankrupt on the banks' note, however, was the net after deduction of expenses. Trustee contended (Tr. p. 177) that in determining assets and liabilities of bankrupt, if the gross sales price be listed as assets, the expenses incurred in realizing the gross sales price must be considered as liabilities. This examination was conducted over the objections of banks' counsel and the evidence received subject to such objections. Counsel for the trustee is correct in his *524 contention, on the facts of this case, and the objections thereto cannot be sustained.
It is to be remembered that, at the insistence of the banks, bankrupt on October 20, 1960, signed the agreement (Trustee's Ex. A) in which he agreed that Garrison was to sell the property; that Garrison was to employ help for harvesting, the expense of which was to be paid from the proceeds of sale; and that the money was to be handled through an escrow account at the First National Bank in Centralia. This escrow account was carried in the name of "T. C. Garrison, Agent, American National Bank & Trust Company, Centralia, Missouri". The ledger sheets of this account are Trustee's Ex. B. Garrison's itemized statement of the liquidation, showing sales, expenses paid and remittances to the American National Bank is Banks' Ex. 19. It was offered by the banks' and received in evidence before the controversy on cross-examination arose. (Tr. p. 98).
The construction the banks placed upon the liquidating agreement of October 20, 1960, is shown by what they did. These facts disclosed by the itemized statement, the escrow account at the Centralia bank, the ledger sheets of the American National Bank (Amer. National Bank Ex. 8) and Garrison's testimony, show that the total amount received from the liquidation was $75,752.25. The expenses incurred were $8,662.64 leaving a balance of $67,089.61, for which bankrupt was given credit on his notes held by the American National Bank. The expense items of $8,662.64 were paid out of the escrow account at the Centralia bank. The effect of this transaction was to charge bankrupt with the expenses.
As above noted the banks added to bankrupt's assets the $36,583.79, realized from sales subsequent to November 21, 1960. Of this amount $23,367.69 represented sales of lambs between January 6 and February 17, 1961. During this period of time corn was bought to "finish lambs" in the amount of $1,077.37; additional corn was bought for $36.00 without designation as to use. These purchases of corn for feeding were no doubt made for the reason that the last of bankrupt's corn, as shown by the itemized statement, was sold November 23, 1960.
The figure of $36,583.79 included $7,177.08 received from sale of corn on November 23, 1960, and the expense shown for shelling and hauling the corn, which was paid November 23, 1960, amounted to $635.34.
Subsequent to November 21, 1960, $1,541.77 was expended for labor on the farm and additional hauling costs incurred in the amount of $11.00.
The itemized statement (Banks' Ex. 19) shows that subsequent to November 21, 1960, there were eleven weekly payments of $60.00 each to "Labor one week (Garrison)", which payments aggregated $660.00. While the record does not affirmatively so show, these payments undoubtedly were to T. C. Garrison, a director of the Centralia Bank, acting as agent for the Chicago bank in the liquidation.
The foregoing expenses incurred subsequent to November 21, 1960, aggregate $3,961.48. Such were, as hereinbefore noted, paid out of the liquidating agents account at the Centralia bank and thus charged to bankrupt. The difference between the $36,583.79, claimed by the banks to be an asset, and the expenses of $3,961.48, was credited to bankrupt on his notes held by American National Bank.
The banks, having treated these expenses as a liability of bankrupt under the liquidation agreement of October 20, 1960, may not now take a contrary position, when so to do is to their advantage, and have the gross proceeds listed as an asset and the expenses ignored as liabilities. The net amount realized, being $32,622.31, will be credited to the assets under item 2 of livestock and crops on the balance sheet (Banks' Ex. 16) instead of $36,583.79 entered thereon by the banks.
The remaining asset, subject to proof of valuation at the hearing, is the farm.
*525 The statute describes the controlling standard of valuation with one brief phrase: "fair".
"Fair valuation" within the meaning of Sec. 1(19) of the Act, means a value that can be made promptly effective by the owner of property to pay his debts. Stern v. Paper, 8 Cir., 183 F. 228, 230 affirmed Paper v. Stern, 198 F. 642 (C.C.A.8th); In re Sedalia Farmers' Co-Op Packing and Produce Company, 268 F. 898, 900 (D.C.Mo.). The Court of Appeals for the Second Circuit citing Stern v. Paper with approval in Syracuse Engineering Company v. Haight, 110 F.2d 468, 471, concludes that under the "balance sheet test" of the Bankruptcy Act, "insolvency" results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price that can be made available for payment of debts within a reasonable period of time, and "fair market value" implies a willing seller and a willing buyer.
The facts from which the fair valuation of the farm on November 21, 1960, is to be found, are the following: on January 27, 1961, a public auction sale of the farm was conducted by Cecil Shopen, an auctioneer of Kansas City, employed by Schindler. This sale was widely advertised. The high and successful bid was $359,000.00 by three individuals acting collectively. Upon conclusion of the sale, bankrupt entered into a contract of sale to the high bidders, title to be free and clear of liens. $359,000 was insufficient to pay then existing liens, including the two deeds of trust. The legal status of this sale and contract had not been determined when bankrupt filed his voluntary petition in bankruptcy March 13, 1961.
On April 3, 1961, the high bidders at the auction sale filed a petition herein seeking enforcement of the sale contract and conveyance of the farm by the trustee in bankruptcy to them. An order entered April 10, 1961, after hearing, finding the contract to be an executory contract, which the trustee in bankruptcy might reject under Section 70, sub. b of the Bankruptcy Act. On April 21, 1961, trustee filed his notice of rejection, which was that day approved by order entered. (Banks' Ex. 1).
The official appraisal in this proceeding (Banks' Ex. 3) made April 14, 1961, by Wallace F. Feutz and Aldridge Green of Audrain County, appointed by this Court, appraised the farm at $455,550.00.
On April 28, 1961, trustee filed a petition for private sale of the farm in one lot to five individuals for $425,000.00, he having received an offer to purchase at this price. After hearing on May 5, 1961, upon statutory notice to creditors and parties in interest, an order entered that day granting the petition. (Banks' Ex. 4). In that order the Court found that the proposed sale price was 93% of the appraised value of the farm and the best price reasonably and readily obtainable. The sale was financed by a reduction of the Equitable Life deed of trust to $275,000.00 assumed by the purchasers, and payment to the trustee of $150,000.00 cash.
The banks offered the testimony of several witnesses as to the value of the farm. Harry Jennings, President of the Centralia Bank from 1957 to March 1961, and at the time of the trial a director of that bank, and real estate broker and appraiser for the Businessmen's Assurance Company (Tr. p. 12), testified he was familiar with the farm and that in his opinion, its fair saleable value on November 21, 1960, was $500,000.00. (Tr. pp. 33, 71).
On cross-examination he said that by the term "fair saleable value" he meant he believed the farm would have sold for $500,000.00; further that this was the value at the time of the auction sale January 27, 1961. (Tr. pp. 71, 72). He also testified he attended the auction sale, but did not bid; that this sale was widely advertised and there was a big crowd present; that he knew of no reason why the auction sale did not represent a fair sale, nor did he know of any reason why the *526 farm did not sell for more than it brought at the auction. (Tr. pp. 63, 72).
It was stipulated (Tr. pp. 170, 171) that if Paul C. Young and Milton G. Kline, were present as witnesses, they would testify that as employees and land appraisers for the Equitable Life Assurance Society of New York, they appraised bankrupt's farm in 1959 at a normal agricultural value of $450,000.00; that on the basis of this appraisal, the insurance company then loaned bankrupt two-thirds of this amount or $300,000.00, using the first mortgage as security.
Truman Garrison, a farmer, director of and appraiser for the First National Bank, Centralia, testified (Tr. p. 95) over the objection of trustee, that, in his opinion, on November 21, 1960, the farm was worth $250.00 per acre, "that is approximately $500,000.00". Counsel for the bank computed the total to be $501,250.00. On cross-examination he testified that the figure of $250.00 per acre was "straight across the board"; he then admitted that the portion of the farm known as the "Herndon Tract", consisting of 225 acres was worth $140.00 to $145.00 per acre; that an 86 acre pasture was worth about $125.00 an acre; that the balance of the farm was worth more than $250.00 per acre, but he had not averaged it out in his figures; he could recall no farms in the vicinity that sold for more than $200.00 per acre in 1960. (Tr. pp. 103-106).
The banks offered the testimony of Lamont Brayman by deposition. (Banks' Ex. 11). He is a real estate broker and had been for ten years; he is also a farmer and machinery dealer. He was familiar with bankrupt's farm, having had an oral listing of it for sale for ten years. (Depos. p. 6). All depositions offered in this trial were subject to ruling by the Court at the hearing, of all objections made at the time the deposition was taken. Eliminating hearsay and immaterial matters properly and timely objected to, this witness testified that he had an opinion as to the reasonable fair market value of bankrupt's farm on November 21, 1960; he testified he broke the farm down in different tracts, using a rough diagram of the farm shown on the brochure prepared by the auctioneer who had conducted the public auction of the farm. (Amer. Natl. Banks' Ex. 1 to the deposition). He had previously written thereon his valuation of each tract. From his testimony (Depos. p. 12) and the diagram it appears he valued 1,700 acres at $300.00 per acre, 225 acres at $140.00 per acre and 86 acres at $90.00, making an aggregate valuation of $549,240.00. He further testified that compared with other farms in the vicinity this farm was half again as fertile, having more lime, rock, phosphate, fertilizer and deep plowing. That in forming his opinion, he had considered the foregoing together with the fact that it is a large tract of land lying together, a good location, fine fences and not top heavy on buildings. (Depos. pp. 13, 14).
On cross-examination the witness testified that he had no personal knowledge of any sales of farms in the vicinity for as much as $300.00 per acre; his own farm land in the vicinity acquired over a period of time from thirteen to two years prior to the trial, had varied in cost from $175.00 to $200.00 per acre, the last figure applying to a purchase two years before (Depos. pp. 19, 20, 21); within the prior six years he had sold land four miles north of bankrupt's farm at an average price of $180.00 per acre and one tract three or four miles east for less than $200.00 per acre (Depos. pp. 21, 22); he further testified there had been no variation in the market value of land in the vicinity for ten years (Depos. pp. 17, 18); he admitted that the barns and houses on bankrupt's farm were in very poor condition (Depos. p. 23); that in speaking of "reasonable market value" he was talking about what it should be worth, not what it would bring on the open market, but it was his opinion it would bring what he said. (Depos. pp. 24, 25). On redirect examination he testified (Depos. p. 36) he knew of no land within ten miles of bankrupt's farm that compared with it in fertility of soil or lay of the land. However, *527 he said some of his land (the purchase of which is above mentioned and is within the ten mile radius) would bring more money than bankrupt's farm while other portions were not worth as much, not being near as fertile. (Depos. p. 35).
The banks in their respective briefs on the question of valuation of the farm refer to what is there denominated the $450,000.00 offer of Wilford Boschert for the farm on May 5, 1961, leaving the inference that his Court turned down such an offer.
The event in question occurred Friday, May 5, 1961, at the hearing on trustee's petition to sell the farm, which had been filed April 28, 1961. The attorneys for the banks were present.
Boschert appeared with his attorney and announced an offer of $450,000.00 for the farm; he had with him a $35,000.00 cashier's check for the required down payment, together with a financial statement.
By reason of the season of the year respecting farming and the necessity of immediate spring plowing and planting, time was of the essence. The contract, which had been prepared prior to the filing of the petition to sell, provided that trustee should deliver possession of all crop lands no later than May 8, 1961, and failure so to do would constitute a material breach of the contract warranting rescission at the option of the buyers.
It further provided that if trustee be unable to furnish abstracts showing good title or the purchasers be unable to obtain financing for the balance of the purchase price, which balance would be $395,000.00, the latter could occupy and operate the farm until February 28, 1962, paying the trustee one-fourth of the revenue, the $35,000.00 down payment to be credited against said one-fourth, but in no event was the trustee to refund any part of the down payment.
Boschert testified he and his attorney had read this contract, they had discussed it and he was prepared to make an offer of $450,000.00, subject to all the terms and conditions set forth in the proposed contract and to presently deposit the $35,000.00.
Counsel for general creditors at the hearing objected to the clause as to the buyers rights in the event of inability to finance the sale, denominating it an "escape clause", by which the proposed buyers could occupy the position of lessees for the oncoming crop year without actually completing the sale. The Court agreed and the clause was stricken with the consent of the proposed buyers, who asserted they were not concerned with it as they were in financial position to complete the sale.
After the prospective purchasers announced they would not pay more than $425,000.00 and would not waive the clause respecting possession May 8th, the Court stated to counsel for Boschert, that if the latter would put up the $35,000.00 and sign the contract with the escape clause omitted, which meant the trustee kept the $35,000.00 in the event Boschert failed to complete the sale, trustee's petition to sell for $425,000.00 would be denied and the farm sold to Boschert. Counsel declined so to do stating they couldn't afford to gamble, but could give an answer Wednesday, May 10th, by which time it could be determined whether or not Boschert could finance the sale.
The Court expressing doubt, based on Boschert's financial statement and testimony, as to his ability to finance the sale, stated that trustee could not gamble either and that the present offer of $425,000.00 would not be rejected and lost on the speculative offer Boschert was making.
Boschert did not have farm equipment to operate the farm and trustee's counsel inquired if he had any agreements with anyone to operate the farm. He answered he had not. Under examination by counsel for the prospective buyers, Boschert testified he had talked to Schindler (Bankrupt) and the latter's brother as to Schindler remaining on the farm, but had completed no arrangements; that his contact with Schindler was on Wednesday, prior to the hearing *528 on Friday, but no definite commitment was made.
On November 21, 1961, the deposition of John Schindler, bankrupt, was taken on behalf of American National Bank. Counsel for both banks were present. While this deposition was not offered in evidence at the trial, it is filed in this bankruptcy proceeding.
During direct examination by counsel for the American National Bank about some of his farm equipment, bankrupt in one of his answers said, "I thought I was going to get my farm back through another buyer. He couldn't get the Court to accept it. We failed on that:" Counsel for trustee pursued this matter on cross-examination and bankrupt testified (Deposition pp. 119 et seq.) that prior to the hearing on May 5, 1961, bankrupt and his brother made an agreement with Boschert that Schindler would operate the farm the first year, Boschert to furnish machinery and help finance the operation; the crops were to be divided on a percentage basis, which he specified in his testimony, and bankrupt and his brother were to furnish money for seed and fertilizer, and if necessary, Boschert would lend him money for the purpose. He further testified that it was agreed that if Boschert could get the farm, "we would later resell the farm and share what we got for it, or we would make a deal to get it back"; that these details were not then completed, because of lack of time. He further testified that Boschert asked him how much he should offer for the farm and he (Schindler) told him $450,000.00.
The record of the hearing on May 5, 1961, discloses that the Court was skeptical of the Boschert offer, which skepticism appears justified by subsequent events. Neither weight nor credence is accorded Boschert's testimony on the issue of fair valuation of the farm.
It is from the foregoing evidence that the Court must make a finding of the "fair valuation" of the farm, that is a fair market value that could be made available for payment of debts within a reasonable time by a willing seller and a willing buyer, the latter, of course, being a buyer able to buy as well as willing.
The sale of a 2,000 acre farm in one tract is no mean undertaking even in Audrain County, evidenced by the fact that the auction sale involved a coalition of three purchasers, and trustee's sale five, the major portion of the price in each instance to be financed through an Equitable Life loan.
Trustee contends the auction sale price of January 27, 1961, in the amount of $359,000.00 establishes the market value on November 21, 1960. This contention is not well taken in view of the fact that the executory contract for that sale was rejected by the trustee because of inadequacy. Furthermore, by private negotiation trustee by April 28th, 1961, had obtained purchasers at a price of $425,000.00.
The appraisal of $455,550.00 made by the Court appointed appraisers, is of course the opinion of the appraisers as to what the property would bring, and is in no way here conclusive.
This is likewise true of the opinions of value expressed by the witnesses offered by the banks.
Opinion evidence of fair valuation is speculative and conjectural. Such has been said to involve an "as-if" philosophy and compel an intellectual tour de force into a fanciful never-never land. Collier (14th Ed.) Vol. 1 page 113.
It involves an effort to find out not what a real buyer and real seller, under the conditions actually surrounding them do, but what a purely imaginary buyer will pay a make believe seller, under circumstances which do not exist. McGill v. Commercial Credit Co., 4 Cir., 243 F. 637, 647.
The testimony of the witnesses expressing opinions as to valuation and particularly that given under cross-examination, illustrates the wisdom of the above criticism as to the value of such hypothetical evidence.
The best evidence offered here as to the fair market value of the farm, is the $425,000.00 sale made by the trustee *529 after seeking buyers and entering into private negotiations of sale. There being no evidence of any depreciation in value of the farm between November 21, 1960, and the time of trustee's sale, in fact the evidence is to the contrary, the fair market value of the farm on November 21, 1960, the date of the alleged preferential transfer, is found to be $425,000.00.
The assets included in the fact stipulation (Banks Ex. 8) were $55,664.08. The value of the livestock and crops, evidence of which was offered at the trial, has been found to be $32,622.31. These figures added to the found value of the farm, of $425,000.00, show total assets of $513,286.39. Total indebtedness, secured and unsecured, shown by the stipulation, is $514,105.07. There is a deficiency in assets of $818.68. Bankrupt was insolvent on November 21, 1960, and such is here found to be the fact.
An essential element of a voidable preferential transfer is diminution of bankrupt's estate. This is implicit in the very nature of a preference as a transfer of assets, available to creditors, that results in favoring the transferee over other similar creditors who may share in the distribution. Such situation always exists where the alleged preference is obtaining a lien on assets. In the present case if the lien of the deed of trust be found valid to the full extent of the debts of the banks, the assets will be diminished by the amount of $45,610.15 and interest. The effect of the transfer would enable the banks to receive 100% of their debts.
The trustee has on hand $118,844.38. If the banks here prevail, this figure would be reduced by the aforesaid $45,610.15 and interest thereon. Excluding accrued interest, the reduced amount would be $73,234.23. The claim register, of which judicial notice is taken as stated at the trial (Tr. p. 178), shows priority tax claims of $10,281.58; an unpaid secured claim of $130.00 and unsecured claims in the amount of $133,480.72. In addition, there is pending an appeal a disallowed unsecured claim of $17,950.00, which if ultimately allowed will increase the unsecured claims proportionately. Without considering that claim, costs of administration (Court Costs, trustee's compensation and trustee's attorney's compensation) which must be paid from the money on hand, unsecured creditors would receive a dividend of 47% as compared to the transferees' 100%. The effect of the transfer enables the banks to obtain a greater percentage of their debts than other creditors of the same class, an element required under Sec. 60, sub. a(1) of the Act. This question is determined, as is here done, not as of the time of transfer, but as of the time of liquidation in the subsequent bankruptcy. Palmer Clay Products Co. v. Brown, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655.

Notice of Insolvency
Up to this point all the essential elements of a preferential transfer, as defined in Section 60, sub. a(1) of the Act, are found to exist to-wit: a transfer of property on account of an antecedent debt (entirely so as to the American National Bank and all as to the Centralia Bank with the exception of $1,035.68), which transfer was made or suffered by the bankrupt while insolvent and within four months before the filing of the bankruptcy petition, the effect of which transfer enables claimants to obtain a greater percentage of their debts than other creditors of the same class.
There remains the question posed by Section 60, sub. b of the Act. Did these creditors at the time of transfer have reasonable cause to believe that the present bankrupt was then insolvent?
Actual knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is a reasonable cause to believe that the debtor was insolvent. A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditors notice, respecting the affairs and pecuniary condition of the debtor as would lead a prudent *530 business person to the conclusion that the debtor is insolvent. Collier (14th Ed.) Vol. 3 pages 989-991 and many cases cited. A creditor may not willfully close his eyes that he might remain in ignorance of the debtors financial condition. Where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed. Farmers' State Bank v. Freeman, 249 F. 579, 583 (C.C.A.8th); Trepp v. State National Bank, 315 Mo. 883, 289 S.W. 540, 546; Canright v. General Finance Corp., D.C., 35 F.Supp. 841, affirmed 123 F.2d 98 (C.C.A.7th); Security-First Nat. Bank of Los Angeles v. Quittner, 176 F.2d 997, 1000 (C.C.A.9th); Pender v. Chatham Phenix Nat. Bank & Trust Co., 58 F.2d 968, 969, 970 (C.C.A. 2nd); Collier (14th Ed.) Vol. 3 p. 995. This must be determined from the facts of each case, and this returns us to the record for the facts bearing on creditors' constructive notice of insolvency.
Dovale, Assistant Vice President of American National Bank, testified he had discussed bankrupt's situation with the latter for months before the meeting of October 20, 1960; he told Schindler operating the 2,000 acre farm was too much for him to handle because "you don't have the capital"; that he couldn't possibly carry on the operation with the small amount of capital bankrupt had; he told Schindler to sell it and get a smaller place (Tr. p. 145); that he (Dovale) knew that sale of the farm had been solicited all over the country from talking with people and Schindler in May, June, July, August and September, 1960. (Tr. p. 149).
Harry Jennings, then President of the Centralia Bank, was aware of the fact that through the summer of 1960, Schindler was continuously overdrawn at the bank, and this was particularly true during the period August 26th to September 21st. (Tr. p. 49).
B. J. Billiter, Executive Vice President of the Centralia Bank, testified by deposition (Bank's Ex. 10) that during the last mentioned period, there was a credit balance on only one day; there were numerous overdrafts during the period; September 7th, bankrupt was overdrawn $2,260.97, the highest overdraft during this time being $2,358.79 (pp. 24, 25); that these overdrafts were a matter of concern to the bank and Schindler was called in and the condition of his account discussed; even the bank examiners talked to Schindler about the matter (pp. 25, 31); at the time of the execution of the deed of trust, Billiter knew from hearsay that Schindler was in financial trouble. (p. 30).
In October when it was discovered that mortgaged livestock and crops were being sold by bankrupt, the two banks agreed that all of the personal property would be liquidated to pay the loans (Tr. p. 51); prior to the execution of the liquidating agreement of October 20, 1960, Jennings had talked with bankrupt and a representative of the American National Bank relative to bankrupt's account. (Tr. p. 52).
Dovale attended the meeting of October 20, 1960, with bankrupt, Jennings and Garrison; he discussed with bankrupt the legal effect of selling the mortgaged property and asked bankrupt if he knew the law in connection with the matter (Tr. p. 54); it was then decided to foreclose the chattel mortgages held by the American National Bank and the latter bank would extend no further credit. (Tr. pp. 143-145).
While the liquidation agreement of October 20, 1960, (Trustee's Ex. A) provided that after the entire liquidation of the personal property was completed, bankrupt would execute a note for any deficiency secured by a deed of trust on the farm, the banks awaited no such determination. Within one month thereafter, while the liquidation was in progress, the banks obtained the collateral agreements of November 17, 1960, by which the American National received as additional collateral bankrupt's note for $125,000.00, and the Centralia Bank his note for $25,000.00, both secured by the deed of trust on bankrupt's entire *531 farm. At that time bankrupt owed the American National $87,400.16, which was reduced to $38,430.97 upon completion of the liquidation of the personal property. (Amer. Natl. Bank's Ex. 8). Bankrupt then owed First National Bank, Centralia, $11,452.27 (1st Natl. Bank Ex. 1G) secured by assigned life insurance policies, upon which the bank subsequently realized $7,217.45. (Tr. pp. 19, 20). The amounts of the two notes were greatly in excess of any obligation owed the respective banks.
At this time and on November 21, 1960, the transfer date, Schindler's farm operating account at the Centralia Bank had a balance of $2.70 and this had been the status of that account since October 18, 1960 (Tr. p. 50; Billiter's Deposition p. 23); the Catherine Schindler account had a balance of $963.66 after deposit of the $1,000.00 loan of November 19th (1st Natl. Bank Ex. 1-I); there was at the time a very small balance in the feed and fertilizer account (Billiter's Deposition p. 23); the ledger sheet (Amer. Bank's Ex. 29E to the Deposition) shows a balance of $188.39 on November 2, 1960, and the bank could not find the record from that date to November 21st; on this latter date bankrupt had notes overdue at the Centralia Bank for at least $6,000.00. (Tr. p. 67; Billiter Depos. p. 53).
The foregoing facts disclose circumstances which were sufficient to incite both banks to make inquiry as to bankrupt's financial condition prior to November 21, 1960, the date of transfer established by the recording of the deed of trust. Farmers' State Bank v. Freeman, 249 F. 579 (C.C.A. 8th); In re Shelley Furniture Co. (Exchange National Bank of Chicago v. Curtis), 283 F.2d 540 (C.C.A.7th); Security First National Bank of Los Angeles. v. Quittner, 176 F.2d 997 (C.C.A.9th); Pittsburgh Plate Glass Co. v. Edwards, 148 F. 377 (C.C.A.8th); Boston National Bank v. Early, 17 F.2d 691 (C.C.A.1st); Pender v. Chatham Phenix Nat. Bank & Trust Co., 58 F.2d 968, 969 (C.C.A.2nd); Buchanan State Bank v. De Groot, 39 F. 2d 397 (C.C.A.6th); Collins v. Bank of Titusville, 36 F.2d 482 (C.C.A.5th).
The banks are charged with all the knowledge which would have been acquired had an investigation been conducted. They are charged with knowledge of bankrupt's insolvency on the date of the transfer. Bassett v. Evans, 253 F. 532, 536 (C.C.A.8th); Coder v. McPherson, 152 F. 951, 954 (C.C.A.8th); and cases hereinbefore cited on constructive notice.
The taking of the deed of trust by the banks as security for the two notes, constituted a preferential transfer on November 21, 1960, the date of recording, in its entirety as to the American National Bank, and to the extent of the antecedent debt owed First National Bank, Centralia. It was not a preferential transfer as to the subsequent advances of $1,035.68 made by the First National Bank under the future advances clause of the collateral agreement of November 17, 1960.
First National Bank's counsel states in its reply brief that the best argument against the contention of the bank's knowledge of insolvency is that the bank extended the additional subsequent credit, hereinbefore noted. Such argument has no merit in the face of the facts. The bank had as security the assigned insurance policies, the deed of trust on the farm, which secured any such advances under the collateral agreement; the bank's officers thought it had plenty of security and "the collateral agreement took care of all the bank's liabilities". (Tr. pp. 62, 70). This was the testimony of Harry Jennings, then President of the bank, as to the subsequent loans. His estimate of the situation was correct had bankruptcy not intervened.

Interest
Mortgagees are entitled to interest beyond the date of filing the bankruptcy petition and up to the date of sale, where the proceeds of the mortgaged *532 property sold by the trustee are sufficient to pay the principal of the debt and interest. Coder v. Arts, 152 F. 943 (C.C.A. 8th) affirmed 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772. Otherwise interest stops at the date of the filing of the bankruptcy petition. Section 63, sub. a(1) Bankruptcy Act (11 U.S.C. § 103, sub. a(1)); Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 257, 55 L.Ed. 244; In re Smith-Flynn Commission Co., 292 F. 465, 468 (C.C.A.8th).
The claim of the American National Bank is based upon the note of January 3, 1961, in the principal amount of $45,163.76, with balance due of $38,430.97 on March 13, 1961, the date of bankruptcy, and accrued interest to that date of $496.63. The proceeds of sale of mortgaged property by the trustee, upon which this bank has a valid lien, is the $12,000.00 representing the wheat crop. The security did not produce a sufficient amount to pay the debt in full and American National Bank cannot recover post-bankruptcy interest.
The claim of First National Bank is based on two notes, one dated January 16, 1961 in the amount of $13,500.00, which has been heretofore found to be an antecedent debt except as to a present consideration of $635.68; the second note is dated February 14, 1961, in the amount of $400.00. This note and the above $635.68 have heretofore been found to be secured under the future advances clause of the collateral agreement and under the deed of trust. The security (deed of trust) was sufficient to pay principal and interest on this indebtedness to date of sale and claimant is entitled thereto. Post-bankruptcy interest cannot be allowed on the balance of the $13,500.00 note, representing the antecedent debt.
The date of sale was June 1, 1961, being the day the sale of the farm was closed and trustee received the money.
The $400.00 note of February 14, 1961, was due March 1, 1961. It provides for interest from date at 6% to maturity, and at 8% from maturity to payment. No interest has been paid on the note. Claimant is entitled to interest at 6% from February 14, 1961, to March 1, 1961, in the amount of $1.18 and from March 1, 1961, to June 1, 1961, at 8%, in the amount of $8.00.
The $13,500.00 note of January 16, 1961, was due March 1, 1961. It provides for interest at 6% from date to maturity and at 8% from maturity to payment. There are two payments endorsed on the note, each shown to have been applied on principal. No interest has been paid on the $635.68, present consideration included in this note. Claimant is entitled to interest on $635.68 from January 16, 1961, to March 1, 1961, at the rate of 6%, in the amount of $4.85 and from March 1, 1961, to June 1, 1961, at the rate of 8%, in the amount of $12.71.

Attorney's Fees
First National Bank includes in its claim attorney's fees in the amount of 10% of the full amount due. American National Bank makes a like claim.
The deed of trust contains no provision for attorney's fees.
The note which forms the basis of the claim of American National Bank provides:
"If this note is not paid at maturity, and it is placed with an attorney-at-law for collection, there shall be due and payable by the parties liable hereon, in addition to the unpaid balance and interest, a reasonable attorney's fee, which it is agreed shall be a sum equal to ten (10%) percent of the total amount due if paid prior to the institution of suit, or to fifteen (15%) percent of the total amount then due, if paid subsequent to the institution of suit."
The $400.00 note of February 14, 1961, held by First National Bank, contains an identical provision with respect to attorney's fees.
*533 The second note upon which the latter bank's claim is based, which is the $13,500.00 of January 3, 1961, provides:
"if this note shall not be paid at maturity and shall be placed in the hands of an attorney for collection, the undersigned further promises to pay, as attorney's fees for collection, ten per cent additional on the full amount due hereon."
There is no evidence in this case that the notes were placed with attorneys for collection prior to the commencement of this bankruptcy proceeding or that any services were rendered in attempting such prior collection. Therefore, the services for which the fees are sought must be considered as services in connection with this bankruptcy case.
The validity of a lien for attorney's fees as part of a mortgage lien in bankruptcy, is determined by local law, and construction of the contract providing therefor is likewise a question of local law. The enforcement of the lien in bankruptcy is a federal question. Such fees are no longer disallowed in bankruptcy on the ground of contingent liability or lack of present consideration. Security Mortgage Co. v. Powers, 278 U.S. 149, 49 S.Ct. 84, 73 L.Ed. 236.
Provisions for attorney's fees in a note or mortgage are valid in Missouri.
Whether or not attorney's fees are here allowable depends upon construction of the terms of the contract providing therefor and whether the services here rendered may be said to have been contemplated by the parties. German-American Bank v. Martin, 129 Mo. App. 484, 107 S.W. 1108, 1109; Smith v. Citizens Bank of Gerald, 232 Mo.App. 906, 106 S.W.2d 45, 51.
In Mechanics'-American National Bank v. Coleman, 8 Cir., 204 F. 24, l. c. 31, 32, the Court of Appeals for this Circuit held that legal services rendered a note holder in bankruptcy proceedings were not within the intendment of the following clause of a note:
"In case said above note is not paid when due and payable and the same is placed in the hands of an attorney for collection we agree to pay to the holder thereof 10 per cent. additional on the principal and interest due thereon as an attorney's fee."
Citing this case with approval on this question, our Court of Appeals in the later case of First Savings Bank & Trust Co. of Albuquerque, N. M. v. Stuppi, 10 Cir., 2 F.2d 822, l. c. 824, states:
"Whether the court, in estimating the value of such services should consider legal services in connection with the collection of the indebtedness in the bankruptcy proceedings depends upon two matters: First, whether the parties contracted for the payment of such services; and, second, whether the Bankruptcy Act prohibits allowance for such services.
"As to the first of these propositions: There are several provisions in the mortgage which might be considered in this connection. They are that the services should be paid for if the matter should be `placed for collection in the hands of an attorney.' This provision would not of itself be sufficient to show an intent to include such services in the bankruptcy matter. Mechanics' American National Bank v. Coleman, 204 F. 24, 122 C.C.A. 338 (this court)."
No Missouri cases construing such a clause to the contrary are cited or found.
The attorney's fees clause of the first two notes above cited, in addition to the collection provision further provide for an attorney's fee if the note is paid "subsequent to institution of suit"
The filing of a petition or claim in Bankruptcy Court for the allowance of a debt secured by mortgage, as a lien on proceeds of sale of mortgaged property in bankruptcy, is not the equivalent of a suit so as to permit allowance of attorney's fees under such provisions. In re Ebert, D.C., 140 F.Supp. 597; Phoenix *534 Building and Homestead Ass'n v. E. A. Carrere's Sons, 5 Cir., 33 F.2d 563, cer. den. 281 U.S. 726, 50 S.Ct. 240, 74 L.Ed. 1143.
The services here in question were not within the contemplation of the parties to the agreements, and are not included in the terms of the notes.
The wheat chattel mortgage held by American National Bank provides that upon default, mortgagee may take possession and sell the mortgaged property and that upon such sale "after paying the necessary costs of taking, selling, storing, insuring and taking care of said property, including attorney's fees, and satisfying said debt out of the proceeds of such sale, shall pay over the surplus, if any, to me or us".
This provision restricts attorney's fees to services in connection with a sale by the mortgagee. Such repossession and sale were not had, as the mortgaged property was sold by the trustee in bankruptcy. No attorney's fees may be allowed in this bankruptcy proceeding based on the provisions therefor in this chattel mortgage. In re Essential Industries Corporation, 150 F.2d 326 (C. C.A.2nd).
In view of the foregoing, attorney's fees will be denied.
Claim No. 45 of American National Bank will be allowed as a secured claim in the amount of $12,000.00 and as an unsecured claim in the amount of $26,927.60.
Claim No. 56 of First National Bank, Centralia, will be allowed as a secured claim in the amount of $1,062.42, and as an unsecured claim in the amount of $5,646.87.
The respective petitions to establish liens will be sustained as to the amount above found to be secured on the respective claims.
Orders will enter in accordance with the foregoing. No findings of fact or conclusions of law are made or given other than in this memorandum contained.